# MARDEN v. HOPKINS.

DEEDS; DELIVERY: BURDEN OF PROOF; ACKNOWLEDGMENT; EQUITABLE
CONVERSION; WILLS; CONSTRUCTION.

1. The burden of showing that a deed in the possession of the grantee at
the time of his death was never actually delivered to him is upon
the grantor.  (Citing *Carusi* v. *Savary*, 6 App. D. C. 330; and
*Walker* v. *Warner*, 31 App. D. C. 76.)

2. Where a deed sufficient to vest a title is delivered to the grantee, the
intent of the parties thereto must be determined by reference to
the deed itself, as in such case the law raises the presumption of
an intent to pass the title in accordance with its terms, and not
otherwise.  (Citing *Newman* v. *Baker*, 10 App. D. C. 187; *Bieber*
v. *Gans*, 24 App. D. C. 517; and *Walker* v. *Warner, supra.*)

3. The verity of a notary's certificate to a deed cannot be impeached by
the unsupported and equivocal testimony of the grantor to the effect
that she had never seen the notary until a date later than the date
in the certificate; since to overcome the presumption arising from
such a certificate, there must be proof of gross concurrent mistake
or fraud, through strong and disinterested evidence.  (Following
*Ford* v. *Ford*, 27 App. D. C. 401.)

4. *Quære*, whether an acknowledgment is necessary as between the parties
to a deed.  (Citing *Fitzgerald* v. *Wynne*, 1 App. D. C. 107; *Dulany*
v. *Morse*, 39 App. D. C. 523; and *Staples* v. *Warren*, 46 App. D. C.
363.)

5. A contract for the sale of land effects an equitable conversion of the
land into personalty; and, if the vendor dies before giving a deed
to the vendee, his right to the unpaid purchase money passes to
his personal representative.  (Following *Griffith* v. *Stewart*, 31 App.
D. C. 29.)

6. Where a testator gave to his wife a certain sum, to be paid in cash
to her, or, if she preferred, she might select an equal amount of
his securities based on their face value, such bequest to take prece-
dence and priority over, and to be paid and satisfied before, any
of the subsequent bequests; one of which gave to the testator's busi-
ness associate certain stock worth considerably more than par, it

NOTE.—On sufficiency of evidence to impeach certificate of acknowledg-
ment of deed, see note in 6 L.R.A. (N.S.) 442.

was held that the widow could not take the stock so specifically bequeathed, for the reason that to permit her to do so would defeat the evident intention of the testator.   (Mr. Chief Justice SMYTH dissenting.)

Nos. 3037 and 3038. Submitted October 9, 1917.  Decided January 7, 1918.

HEARING on appeals from a decree of the Supreme Court of the District of Columbia upholding the validity of certain unrecorded deeds to real estate; declaring certain real estate to be personal property under the doctrine of equitable conversion; and construing a will.                                    *Affirmed.*

The COURT in the opinion stated the facts as follows:

· These are appeals from a decree in the supreme court of the District in consolidated equity causes.   The first of these causes was instituted by Earl P. Hopkins, in his own right and as executor of Edwin R. Marden, against Clara A. Marden, his widow, as executrix and in her own right.   Two of the objects of that suit were to have certain real estate, known as Villa Park, Villa Park Heights, and Sherwood, held by Mrs. Marden by record in fee simple and claimed to be owned by her, decreed to be the property of Edwin R. Marden; and to have certain real estate decreed to be personal property under the doctrine of equitable conversion.

The second suit was instituted by Mrs. Marden to have construed the will of her husband.

Mr. Marden died on August 18, 1914, leaving a last will executed June 12, 1912, which was duly admitted to probate. Mr. and Mrs. Marden were married in Maine in 1890, when neither had property.   They subsequently went West, where Mr. Marden apparently was unsuccessful in business, for when he came to Washington in 1906 he was in debt and there were unsatisfied judgments against him.   After coming to Washington Mr. Marden's business consisted largely in buying real estate as acreage property, subdividing it and selling it in lots. The sales were made through the National Co-Operative Realty Company, which he had organized and controlled.   His busi-

ness prospered to such an extent that at the time of his death
he had accumulated property aggregating about $300,000.   It
is in evidence that he gave his wife large sums of money from
time to time.   She possessed no other means.   It further ap-
pears that it was the general practice of Mr. Marden to take
title in lands purchased by him in the name of Mrs. Marden,
and this practice was adhered to when Villa Park, Villa Park
Heights, and Sherwood were purchased, between February of
1910 and March of 1911.

After Mr. Marden's death, as shown by the evidence, there
was found in his safe where his will also was found, an envelop,
on the outside of which, in the handwriting of Mr. Marden,
was the following indorsement:

Deeds to Sherwood
Villa  Park
Villa  Park  Heights.
From Clara A. Marden
to
E. R. Marden.

Within the envelop were three quitclaim deeds to the above-
described pieces of property, purporting to have been duly exe-
cuted by Mrs. Marden.   These deeds bear date of May 7, 1912,
and appear to have been acknowledged before a notary on that
date.   The material recitals of each deed are as follows:
"Whereas, heretofore,   *   *   *   the party hereto of the sec-
ond part (Marden), purchased a certain tract, piece, or parcel
of land   *   *   *   and paid for same out of his own funds,
and had the title thereto conveyed to the party of the first part,
his wife, as trustee for him and to dispose of and convey the
same as he might from time to time direct, and   *   *   *
Whereas, the party hereto of the second part has sold or con-
tracted to sell to various persons a number of the lots in said
subdivision, and now desires that the party hereto of the first
part convey to him all of the hereinafter described tract of land
conveyed to her as hereinbefore set forth, the said party of the
first part being willing to do so, executes these presents."

These deeds were witnessed by a Mr. Richard E. Street, an entirely disinterested witness, who testified that, while he was not personally acquainted with Mrs. Marden at the time she acknowledged them, he had known who she was for several months. The witness then described Mrs. Marden and stated that she had acknowledged the deeds in his presence and in the presence of the notary, whose certificate was attached thereto. Mr. Street was not cross-examined, nor was his credibility challenged. When the deeds were offered in evidence Mrs. Marden's counsel admitted that she had signed them, but objected to their introduction, "for the purpose of proving the vesting of title, because the acknowledgment of the deeds had not been shown." The objection was overruled and an exception noted.

Over objection by Mr. Hopkins' counsel that any agreement between the witness and her husband to hold the above deeds in escrow was inadmissible, Mrs. Marden testified that she signed them so that if she predeceased her husband his business would not be tied up pending the settlement of her estate; that they were not to be acknowledged or recorded; that she "understood it was not necessary to record them then." The witness further testified that she had "seen Mr. De Lashmutt, whose signature appears as notary on these three deeds," but not until a date later than the date appearing in his certificate. She did not call Mr. De Lashmutt as a witness, however.

*Mr. Myer Cohen* and *Mr. William G. Johnson,* for the appellant, in their brief cited:

*Catholic Cathedral* v. *Manning,* 72 Md. 132; *Clark* v. *Graham,* 6 Wh. 577, 579, 580; *Delehanty's Estate,* 95 Pac. 111; *French* v. *French,* 3 N. H. 254; *Hendon* v. *White,* 52 Ala. 603; *Merwin* v. *Camp,* 3 Conn. 41; *Nickel* v. *Brown,* 75 Md. 185; *Parrott* v. *Kumpf,* 102 Ill. 427; *Smith* v. *Hunt,* 13 Ohio, 269.

*Mr. Walter C. Clephane* and *Mr. Alan O. Clephane,* for the appellee, in their brief cited:

*Asylum* v. *Corporation,* 7 D. C. 259; *Bieber* v. *Gans,* 24

App. D. C. 517; *Re Brandreth,* 64 App. Div. 566, 72 N. Y. Supp. 333; *Bunten* v. *Am. Sec. & Tr. Co.* 25 App. D. C. 226; *Carusi* v. *Savary,* 6 App. D. C. 330; *Chew* v. *District of Columbia,* 42 App. D. C. 410; District of Columbia Code, secs. 492, 499; 40 Cyc. 1549, 1959, 1993, 1994; *Dulany* v. *Morse,* 39 App. D. C. 523; *Fargo* v. *Squires,* 154 N. Y. 250, 48 N. E. 509; *Fitzgerald* v. *Wynne,* 1 App. D. C. 107; *Ford* v. *Ford,* 27 App. D. C. 408; *Griffith* v. *Stewart,* 31 App. D. C. 29, 217 U. S. 323; *Harris* v. *Ross,* 57 N. C. 413; *Hitz* v. *Jenks,* 123 U. S. 297; 2 Jarman, Wills, 1497, 1498; *Larned* v. *Adams,* 1 H. & H. 384; *Re Libby,* 37 Wash. L. Rep. 690; *Maxwell* v. *McDonald,* 44 Wash. L. R. 740; *Newman* v. *Baker,* 10 App. D. C. 187; *Walker* v. *Warner,* 31 App. D. C. 76; 30 Stat. at L. 520, 531.

Mr. Justice ROBB delivered the opinion of the Court:

There is no evidence even tending to show that any fraud or imposition was practised upon Mrs. Marden in obtaining her signature to these deeds, or that their possession by Mr. Marden was secured by improper means; and, they having been in the possession of Mr. Marden at the time of his death, the burden was upon her to show that they actually never were delivered to him. *Carusi* v. *Savary,* 6 App. D. C. 330; *Walker* v. *Warner,* 31 App. D. C. 76. The intent of the parties must be determined by reference to the deed itself where, as here, a deed sufficient to vest a title is delivered, for the law raises the presumption of an intent to pass the title in accordance with its terms, and not otherwise. *Newman* v. *Baker,* 10 App. D. C. 187; *Bieber* v. *Gans,* 24 App. D. C. 517; *Walker* v. *Warner,* 31 App. D. C. 76, 89.

We are asked to impeach the verity of the notary's certificate appearing on these three deeds and reject the testimony of a disinterested witness concerning their acknowledgment by Mrs. Marden upon her equivocal and unsupported testimony. To do so would be violative of the well-established rule that to overcome the presumption arising from such a certificate there must be proof of gross concurrent mistake or fraud, through strong

and disinterested evidence. Thus in *Kerr* v. *Russell*, 69 Ill. 669, 18 Am. Rep. 634, it was said: "The unsupported testimony of a party to a deed, that he did not execute it, shall not prevail over the official certificate of the officer taking the acknowledgment. Public policy, the security of titles, the peace of society, demand such a rule and a strict adherence to it." And in *Howland* v. *Blake*, 97 U. S. 624, 24 L. ed. 1027, the court observed: "A judgment of the court, a deliberate deed in writing, are of too much solemnity to be brushed away by loose and inconclusive evidence." The question was fully considered in *Ford* v. *Ford*, 27 App. D. C. 401, 6 L.R.A.(N.S.) 442, 7 Ann. Cas. 245, and we regard the decision in that case as conclusive here.

In view, therefore, of our conclusion that there is not sufficient evidence to impeach the verity of the notarial certificates attached to these deeds, it is unnecessary for us to determine whether, under the provisions of the Code,[1] acknowledgment is necessary as between the parties. But see *Fitzgerald* v. *Wynne*, 1 App. D. C. 107; *Dulany* v. *Morse*, 39 App. D. C. 523; *Staples* v. *Warren*, 46 App. D. C. 363.

It was averred in the bill of Mr. Hopkins, and admitted by the answer, that at the time of the death of Mr. Marden "a large number of lots in the four subdivisions hereinabove mentioned had been sold to purchasers thereof. * * * To some of these lots, deeds had already passed. To others no deeds had passed, but contracts had been entered into with various purchasers thereof, to pay for same in instalments, a deed to be given when the purchase money should reach the amounts agreed upon with said purchasers, respectively, the deferred purchase money then to be evidenced by promissory notes usually to be secured by first deeds of trust upon the lots so sold, as aforesaid." It was prayed that such of these lots as belonged to the estate should be treated as personal estate under the doctrine of equitable conversion. The court so treated them, and the ruling was right under the authority of *Griffith* v. *Stewart*, 31 App. D. C. 29.

The will of Mr. Marden, dated June 12, 1912, in its first

---

[1]D. C. Code sec. 499 [31 Stat. at L. 1268, chap. 854.]—REPORTER.

paragraph revokes former wills and in the second paragraph provides for the payment of certain debts and funeral expenses. The remaining paragraphs, so far as material, are as follows:

"3. To my beloved wife, Clara A. Marden, I give, bequeath, and devise absolutely all my household goods, chattels, furniture, jewelry, horses, carriages, and automobiles, and the residence which we now occupy as a home, situated in the District of Columbia, at the corner of Sixteenth street and Blagden avenue, the same being also known and described as and being lots numbered seventeen (17) and eighteen (18) in square numbered twenty-six hundred and fifty-four (2,654). I further give, bequeath, and devise to my said wife the sum of twenty-five thousand (25,000) dollars, to be paid in cash to her, or, if she prefers, she may select from any bonds, stock, or other securities which I may own at the time of my death, so much thereof as, at their face value, shall be equivalent to the sum of twenty-five thousand (25,000) dollars; the bequests and devises thus made to my wife are to take precedence and priority over all other legacies and bequests hereinafter made in this will, none of which are to become effective unless and until the said bequests and devises to her have been delivered, paid over to her, and satisfied."

"4. To my esteemed private secretary, Miss Hulda Halverson, if she survive me, in recognition of her fidelity to my interests, and of her services rendered to me during a long series of years, I give, bequeath, and devise the sum of five hundred (500) dollars, and in addition, subject to the conditions hereinafter specified, the sum of one hundred (100) dollars a month, to be paid to her by my executors, hereinafter named, on the first day of each and every month, for the period commencing with the date of my decease, and ending at the time of her decease;   *   *   *"

"5. To my esteemed friend and business associate, Earl P. Hopkins, now of the city of Washington, District of Columbia, if he survive me, I give and bequeath all the stock which I now own, or may own at the time of my death, in the Washington Civil Service School, and in addition one fourth of the stock which I now own, or may own at the time of my death, in the

Model Printing Company. Should said Earl P. Hopkins not survive me, then I give and bequeath the said stock to his widow, Jeanette Y. Hopkins, if she survive me. If she does not it shall, in that event, form part of my residuary estate to be disposed of as hereinafter directed.

"6. To my sister, Merta A. Marden, if she survive me, I give and bequeath the sum of two thousand (2,000) dollars in cash, or its equivalent in value in other property, at the discretion of my executors hereinafter named.

"7. To my esteemed friend and business associate, Walter McDonnel, if he survive me, I give and bequeath one half of such capital stock as I now own, or may own at the time of my decease, in the National Co-operative Realty Company.

"8. To my esteemed friend and business assistant, Cora B. Talley, if she survive me, I give and bequeath the remaining half of such capital stock as I now own, or may own at the time of my death, in the National Co-operative Realty Company.

"9. To my esteemed friend and bookkeeper, Elizabeth G. Libbey, if she survive me, I give and bequeath one thousand (1,000) dollars, in cash, or its equivalent in other property, at the discretion of my executors hereinafter named.

"10. To my esteemed friend and foreman, Samuel, usually called 'Dock,' Burnside, if he survive me, I give and bequeath three fourths of such capital stock as I now own, or may own at the time of my death, in the Model Printing Company.

"11. All of the foregoing bequests, legacies, and devises, other than those made to my wife in paragraph numbered 3 of this will, are made subject to the express condition that the bequests, legacies, and devises made to my said wife, in said paragraph, shall first be paid and satisfied out of my estate, and in the event that the remainder of my estate shall not be sufficient to provide for all the remaining bequests and legacies hereinbefore made, it is my will, and I direct that my executors, hereinafter named, shall pay and satisfy said bequests and legacies in the order of priority in which they have been made herein, beginning with the bequest or legacy made in paragraph numbered 4 hereof, and so proceeding until such remainder of my estate has been exhausted; my intent and meaning being

that my just debts and obligations shall first be paid and satisfied, as provided in paragraph 2 hereof, and next that the bequests and devises to my wife, made in paragraph numbered 3, shall then be paid and satisfied, and then the others, following in the order of priority in which they are stated in the various numbered paragraphs of this my will.

"12. After the payment and satisfaction of all of the foregoing legacies, bequests, and devises, I give, bequeath, and devise the rest and residue of my estate, real, personal, and mixed, of which I may die seised and possessed, or to which I may be entitled at the time of my decease, to my beloved wife, companion, and helpmate, the aforesaid Clara A. Marden, absolutely and in fee.

"13. Lastly, I do nominate and appoint my beloved wife, Clara A. Marden, and my esteemed friend, Earl P. Hopkins, to be the executors of this my last will and testament; they to serve as such without bond, so far as the law will permit."

Mrs. Marden contends that she has the right to take the stock bequeathed by the 5th paragraph of the will to the testator's "esteemed friend and business associate," Mr. Hopkins. The ruling of the learned trial justice was against this contention, and the question now is before us.

From the inventory of the estate it appears that the testator, at the time of his death, held stock in twelve different corporations. It was assumed in the trial court, and that assumption was acquiesced in by counsel for Mrs. Marden, that the stock in the Washington Civil Service School was worth considerably more than par, and of course this must be so else Mrs. Marden would not desire it. Under the inventory the stock in all but one of the other corporations is appraised as of no market value, but neither side acquiesced in that appraisal, and, even if such acquiescence had been made, the evidence fails to show that the stock had no value at the time the will was made.

We agree with the learned trial justice that this will must be read as a whole, and that when so read it is possible to harmonize all its provisions and to effectuate the intent of the testator as therein disclosed; and the intent of the testator is the pole star for the guidance of courts in the construction of

wills. We cannot do better than quote from the opinion of the court below: "Now, is it not possible to give this will a construction that will secure the rights of all and respect the wishes of Mr. Marden? Let us suppose, by way of example, that this stock in the Civil Service School was worth three times—or we will say twice—its face value, and that Mr. Marden knew that when he made the will, or when he died, leaving the will to come into operation. When he said, 'I want my wife to have $25,000 in cash' or whatever stocks, bonds, or securities he might have, did he mean that she could take this legacy away from Mr. Hopkins? Let us say that he knew it was worth two or three times as much as the face value. He would know that if she acted from mercenary motives she would not hesitate a moment; that she would of course say, 'Instead of taking the cash I will take the stock, as it is worth two or three times its face value.' If that was what Mr. Marden's idea was, then he simply intended to leave to Mrs. Marden to say whether his gift to Mr. Hopkins should be effective or not. Must we not believe that he supposed that unless there was some deficiency his wishes with respect to Mr. Hopkins would be respected by his widow? Can we conceive for a moment that he thought that Mrs. Marden would say, 'This stock is worth more than $25,000; so I will take it and defeat this clause of my husband's will to give this stock to Mr. Hopkins, although I may get half a million dollars in the residuary clause; although there is no deficiency, although there is nothing in the estate to prevent my husband's wishes being carried out in full, yet he has given me a chance to defeat this legacy, and of course he must have known that if I acted from mercenary motives I would take this stock, because it is worth so much more.' If we look at that as Mr. Marden looked at it, is there any possible escape from that conclusion? That is, that he never dreamed that his wife would take away this bequest to his esteemed friend and business associate, who helped to build up this business, simply from mercenary motives? I cannot conceive of it. It seems to me it is entirely unreasonable."

Under the third paragraph of the will there is first bequeathed and devised to Mrs. Marden household goods, furniture, etc.,

and the family residence. She then is given $25,000, "to be
paid in cash to her, or if she prefers, she may select from any
bonds, stocks, or other securities" owned by the testator at his
death, or so much thereof as at their face value should be equiva-
lent to that amount. These bequests and devises, it then is pro-
vided, "are to take precedence and priority over all other lega-
cies and bequests hereinafter made in this will, none of which
are to become effective unless and until the said bequests and
devises to her have been delivered, paid over to her, and satis-
fied." Reading this paragraph in connection with what follows,
and assuming as we must that the testator was a reasonable man
and intended that his will should receive a reasonable interpre-
tation, we think it quite apparent that he intended his wife to
have the personal property mentioned in paragraph 3, the fam-
ily residence, and $25,000 before anyone else should take any-
thing. There is thus expressed the testator's conception of his
absolute duty to his wife. If, after the satisfaction of this pri-
mary obligation, more remained, the testator clearly and defi-
nitely determined what should be done with that residue.
First, he generously provides for his private secretary; and,
second, gives and bequeaths "all the stock which I may now own,
or may own at the time of my decease, in the Washington Civil
Service School," to "my esteemed friend and business associate,
Earl P. Hopkins, now of the city of Washington, District of
Columbia, *if he survive me.*" In addition, one fourth of the
stock owned by the testator in the Model Printing Company is
given Mr. Hopkins. The personal character of this bequest and
the sense of obligation resting upon the testator further is evi-
denced by the provision that, if Mr. Hopkins should not survive
him, the bequest should go to Mrs. Hopkins in case she survived
the testator. That this was intended to be a personal gift of
stock in the particular corporations mentioned, rather than a
money equivalent, further is apparent from the failure of the
testator to make an alternative bequest. It may be noted, also,
that the testator, for reasons we must assume to have been ade-
quate to his mind, considered the claims upon him of his friend
and business associate, Mr. Hopkins, as superior to those of
testator's sister.

In the 11th paragraph testator provides that the preceding specific bequests "are made subject to the express condition that the bequests, legacies, and devises made to my said wife, in said paragraph, shall first *be paid and satisfied* out of my estate, * * * my intent and meaning being that my just debts and obligations shall first *be paid and satisfied,* * * * and next that the bequests and devises to my wife * * * shall then *be paid and satisfied,* and then the others, following in the order of priority in which they are stated in the various paragraphs of this my will." The first concern of this testator was that his just debts and obligations should be "paid and satisfied." Next came the provisions for his wife, and then those for his friends and sister.

It is insisted, however, that the 12th paragraph, making Mrs. Marden the residuary legatee, renders nugatory the provision in paragraph 3, that she might select from any bonds, stocks, or other securities owned at testator's death, unless that provision be given the interpretation contended for by appellant. Even conceding the correctness of this suggestion, no one would be harmed, while on the other hand far greater inconsistency would result between the 3d and 5th paragraphs of the will; for the clearly apparent intent of the testator that his friend and business associate should have the Civil Service School stock would be defeated. But we perceive no inconsistency between the residuary clause and paragraph 3. It well may have happened that the value of stock and securities other than those specifically bequeathed should have been no more than sufficient to pay the debts and leave $25,000 cash with which to pay and satisfy the specific bequest to Mrs. Marden. In that event Mrs. Marden would have had an election between the stocks and securities and the money bequests, for there would have been no residuary estate. It may be suggested that this was a very remote possibility, but it may not have seemed so to Mr. Marden, whose business was of a speculative nature and whose will was made when he apparently was in the full vigor of life, so that he could not have felt certain as to what would be the condition of his estate at his decease. Moreover, by the express terms of paragraph 5, the stock bequeathed to Mr. Hop-

kins or to his wife could form no part of the residuary estate unless both Mr. and Mrs. Hopkins should predecease the testator; for the provision is that if Mrs. Hopkins, although she survive her husband, does not also survive the testator, the stock *"shall, in that event, form part of my residuary estate to be disposed of as hereinafter directed."*

Clearly Mrs. Marden, by claiming the stock specifically bequeathed to Mr. Hopkins and not required to make up her $25,000, is attempting to enlarge the testator's conception of his absolute obligation to her, to the injury of Mr. Hopkins. Should this be permitted it would be necessary, in order that justice should not yield to cupidity, to write into the will a provision not contemplated by the testator; namely, a provision allowing Mr. Hopkins to take cash instead of stock. Even then the evident desire and will of the testator would be thwarted; for it was *stock,* and not money, that he bequeathed to his "esteemed friend and *business associate."*

The decree was right, and is affirmed, with costs.

*Affirmed.*


Mr. Chief Justice SMYTH dissenting:

I am constrained to dissent from the opinion of the court with respect to the construction placed by it upon the part of the will in controversy. To my mind there is no room for reasonable doubt as to what the testator meant thereby. The majority opinion sets out all the provisions of the will necessary to be considered, except paragraph 2, from which I shall quote later.

Mrs. Marden, assuming to act under the power given her by the 3d paragraph of the will, chose so much of the stock bequeathed to Hopkins by paragraph 5 as equaled, at its face value, $25,000, in lieu of the bequest to her of that sum in cash, and the question is whether or not it was the intention of the testator, as expressed in the will, that she should have the right to do so. The 3d paragraph says: "I further give, bequeath, and devise to my said wife the sum of $25,000, to be paid in cash to her, or, if she prefers, she may select from any bonds,

stocks, or other securities which I may own at the time of my death so much thereof as, at their face value, shall be equivalent to the sum of $25,000. * * *" By this provision he gave his wife the right to take the $25,000 in cash, *or* to select bonds, stocks, or securities which at their face value equaled that amount. The bequest of the bonds, stocks, or other securities is as clear and emphatic as the bequest of the $25,000. She could have one or the other as she might elect. Then he followed immediately with these words: "The bequests and devises thus made to my wife are to take precedence and priority over all other legacies and bequests hereinafter made in this will, none of which are to become effective unless and until the said bequests and devises to her have been delivered, paid over to her, and satisfied." Not content with this emphatic declaration for the protection of his wife, he says in paragraph 11, after making the specific bequest to Hopkins of the stock in controversy, as well as after making all the other specific bequests, that "all the foregoing bequests, legacies, and devises, other than those made to my wife in paragraph numbered 3 of this will [meaning, among others, the $25,000 in cash, or the stock], are made subject to the express condition that the bequests, legacies, and devises made to my said wife, in said paragraph, shall first be paid and satisfied out of my estate." Mark you, "all the foregoing bequests," every one of them, the one to Hopkins as well as the rest, are made subject to the bequest to his wife. Still not satisfied with the safeguards he had thus erected around her interests, he adds these words, "My intent and meaning being that my just debts and obligations shall first be paid and satisfied as provided in paragraph 2 hereof, and next that the bequests and devises to my wife, made in paragraph numbered 3, shall then be paid and satisfied, and then the others, following in the order of priority in which they are stated in the various numbered paragraphs of this my will."

In the presence of this language, clear and unequivocal, we are told that it was not his intention to empower his wife to "select from any * * * stocks" which he might own at the time of his death, but only from stocks not specifically devised by him. He made no such exception in his will, and we

have no right to make one for him. His bequest of the stock was just as clear and free from limitations as the bequest of the $25,000 cash. It was a bequest "thus made" which, under paragraph 3, was "to take precedence and priority over all other legacies and bequests," and to which, according to paragraph 11, *all* bequests to *any* other person than his wife should be subject, and which was to be paid and satisfied *before any* other bequest.

Moreover, the testator owned at the time of his death, according to the testimony, stocks, bonds, and other securities in several institutions, eleven in all. He made four specific bequests of stocks,—one to Earl P. Hopkins, the appellee, one to Walter McDonnel, one to Cora B. Talley, and one to Samuel Burnside. The remainder of the stock went into the residue of the estate, which, by the terms of the will, was bequeathed to his wife. Therefore if she exercised the choice given to her, it must have been the testator's intention that she should exercise it with respect to stock bequeathed to some one of the other legatees, for it could not have been his purpose to empower her to choose from stocks which were her own by reason of their having fallen into the residue. This would be to give her no choice at all, and if she might select from the stocks given to one of the legatees why not from that bequeathed to Hopkins rather than from that given to McDonnel or Talley or Burnside. He spoke of each as his "esteemed friend,"—an expression to which the majority seem to attach much weight when applied to Hopkins.

All parts of a will, like those of any other writing, must be read together. Suppose that immediately after the words bequeathing the stock to Hopkins, these words appeared, "provided, however, that this bequest is made subject to the right conferred upon my wife by paragraph numbered 3 to choose said stock in lieu of the $25,000 there given to her," who would doubt that she could take the stock if she so desired? Yet that, in effect, is what the will provides. To every bequest of stock to persons other than the wife, the testator fastened, in legal contemplation, a condition that his wife had the right to select such stock as, at its face value, should be equivalent to $25,000. Unless this construction is adopted, all the precautions taken by the

testator to give his wife's legacies precedence over those of all other beneficiaries are ignored; and why? In order that a bequest to a former business friend might be preserved in kind. This is not sufficient reason in my judgment for disregarding the plain mandate of the testator.

It is said that the choice given to the wife by paragraph numbered 3 was to be exercised only in respect to stock which had not been specifically devised, and which it might be necessary to sell to pay debts; that it was the purpose of the testator to give to her the power when such stock should be offered for sale to choose between it and the $25,000; but this will not do, because the choice could not be exercised until all debts had been paid. This is made clear by the second paragraph of the will, which provides: "After the payment of all my just and legal debts  *  *  *  I give, bequeath, and devise my whole estate, real, personal, and mixed, as follows." After the debts had been liquidated, and not before, the wife had a right to choose between the stock and the money.

This is not a case for the exercise of the imagination. We have no right to speculate as to what the testator meant, when he has given us his meaning in language that is unmistakable. Chief Justice Cooley had before him a question quite similar to this. He said: "The paragraph of the will upon which the question arises is not expressed in ambiguous terms, and there can be no difficulty in giving effect to the apparent intent manifest in it." And then added, in answer to a course urged by one of the parties: "But this method of ascertaining the testator's intent takes us away from a consideration of his language, in which he must be supposed to have carefully expressed his wishes, and invites us to conjecture what probable purpose he had in view which he has failed to express. Whatever may be the probabilities that we shall thereby reach the testator's real intent, it is manifest that this method is not putting a construction upon the will made by him, but it is making a new one of quite a different purport." With approval he quoted from Lord Kenyon in *Hay* v. *Coventry,* 3 T. R. 83–85, 100 Eng. Reprint, 468, as follows: "The general rule which is laid down in the books, and on which alone courts can with any

safety proceed in the decision of questions of this kind, is to collect the testator's intention from the words which he has used in his will, and not from conjecture." *Kinney* v. *Kinney*, 34 Mich. 250–253. That language, supported by many other authorities cited by the learned jurist, forbids me to follow the course pursued by the majority in the present case. See also Story, Const. p. 383; *People* v. *New York C. R. Co.* 24 N. Y. 485–488; *Mayo* v. *Whedon*, ante, 138; *United States ex rel. Parish* v. *MacVeagh*, 214 U. S. 124–135, 53 L. ed. 936–940, 29 Sup. Ct. Rep. 556; *Beyer* v. *Le Fevre*, 186 U. S. 114, 46 L. ed. 1080, 22 Sup. Ct. Rep. 765. I think the language of the court in the *Beyer Case* is peculiarly applicable here; namely, "the express intentions of the testator should not be thwarted without clear reasons therefor."

Would the construction for which I contend, if adopted, leave Hopkins without anything under the will? No. Mrs. Marden was given the choice between $25,000 in cash and the stock. She could not have both. Therefore the money by *necessary intendment* was to take the place of the stock and to go to the person from whom the stock was taken by the exercise of the wife's election. Unless this be true, the $25,000 would go into the residue and in that way reach Mrs. Marden, and thus she would get not only the stock, but also the $25,000. Clearly it was not the intention of her husband that she should have both. He said she was to have the money *or* the stock. By giving effect to this intention, the $25,000 would go to Earl P. Hopkins, who is entitled to receive it.

In my judgment the decree should be modified so as to permit Mrs. Marden to select the stock in question and give Mr. Hopkins, in lieu thereof, the $25,000.