*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 16-PR-150

WILLIAM C. LEWIS, SR., *et al.*,

APPELLANTS,

V.

ESTATE OF ROBERT A. LEWIS, *et al.*,

APPELLEES.

Appeal from the Superior Court
of the District of Columbia
(LIT51-13)

(Hon. Gerald I. Fisher, Trial Judge)

(Submitted December 12, 2017                    Decided September 13, 2018)

William C. Lewis and Esther Y. Lewis, co-personal representatives of the Estate of Amos W. Lewis, Jr., *pro se.*

*John C. Morrison* and *Lilia C. Machado* were on the brief for appellees.

Before GLICKMAN, THOMPSON, and MCLEESE, *Associate Judges.*

THOMPSON, *Associate Judge*:    Plaintiffs/appellants William C. Lewis, Sr. ("William"), and Esther Y. Lewis ("Esther"), co-personal representatives of the

09/13/2018
FILED
District of Columbia
Court of Appeals
Julio Castillo
Clerk of Court

Estate of Amos W. Lewis, Jr.,[1] appeal from December 8, 2015, and December 11, 2015, judgments of the Superior Court, entered upon the verdict in a bench trial, declaring that the real property located at 638 Quebec Place N.W. (the "Quebec Place property") is an asset of the estate of Robert A. Lewis rather than belonging to the estate of Amos W. Lewis, Jr.  Plaintiffs/appellants also contend that the trial court erred in ruling that they were not entitled to a jury trial on their claims.  For the reasons that follow, we affirm.

## I.

This litigation arose out of competing claims to real properties once owned in their entirety by decedent Amos W. Lewis, Jr. ("Amos"), who died intestate in 1992.  Plaintiffs/appellants — Amos's estate and William and Esther, two of Amos's surviving children, who sued in their capacity as personal representatives

---

[1]  The caption page of the *pro se* complaint in this case includes the phrase "In re Estate of Amos W. Lewis, Jr.," and the various orders in the trial court record bear the caption "Estate of Amos W. Lewis, Jr., *et al*. v. Estate of Robert A. Lewis, *et al*."  However, the "Parties" section of the *pro se* complaint in this case listed only William and Esther, in their capacities as co-personal representatives of the Estate of Amos W. Lewis, Jr., as plaintiffs.  Because the Notice of Appeal lists William and Esther as the "person[s] appealing," because William and Esther have continued to proceed *pro se*, and because the estate of Amos W. Lewis, Jr., is not represented by counsel, we use only William's and Esther's names in the caption of this opinion, thereby denying appellants' request to "correct the title."

of Amos's estate — alleged in their complaint that two 1987 deeds fraudulently conveyed title to the Quebec Place property, and to another property located on North Capitol Street, N.W. (the "North Capitol property"),[2] to Amos and his son Robert A. Lewis.

The pertinent background is as follows. After Robert A. Lewis died intestate on August 25, 2013, his son, appellee Robert T. Lewis, who was appointed to administer the estate, listed the Quebec Place and North Capitol properties as assets of the estate of Robert A. Lewis. That prompted William and Esther, who believed that the properties had belonged to Amos alone (after the death of Amos's wife in 1986), to petition for probate of Amos's estate. After their appointment as personal representatives of Amos's estate, William and Esther listed the two properties as assets of Amos's estate.

Thereafter, on November 1, 2013, William and Esther caused the instant suit to be filed in the Superior Court on behalf of Amos's estate, alleging fraudulent conveyance, wrongful withholding of estate assets, and unjust enrichment. The crux of appellants' allegations was that the December 1987 deeds purporting to

---

[2] Appellants appeal only the trial court's judgment as to the Quebec Place property.

transfer interests in the Quebec Place and North Capitol properties to Robert A. Lewis were fraudulent because "the signature[s] conveying title to the properties . . . [were] not Amos W. Lewis's signature." Plaintiffs/appellants alleged that "Robert A. Lewis either forged or caused his father's signature to be forged on the [d]eeds[,] vesting title in himself."

Trial in the matter began on October 26, 2015, and the trial court heard from several witnesses. In the summary that follows, we focus on the testimony the court heard that was relevant to whether the signature on the December 8, 1987, deed conveying the Quebec Place property was Amos's signature.[3] Naomi Williams ("Naomi"), another one of Amos's surviving children, testified that "from about August[] 1987 to the day [Amos] died [in 1992] he was totally with [her]" in Detroit, Michigan. She further testified that after Amos suffered a stroke in November 1987, she went to stay with him in the house he owned in Detroit. She told the court that Amos thereafter had four additional strokes, in 1988, 1989, 1991, and 1992, and potentially "little mini strokes in between." After the second stroke in 1988, Naomi told the court, she "brought [Amos] into her house" where he stayed, and where someone was present with him "24/7," until his death in

---

[3] The court also heard testimony pertaining to Amos's intentions with respect to the properties and to work done on, and real property taxes paid with respect to, the Quebec Place property.

1992. Naomi testified that her father "couldn't travel by himself, and [she and her husband] were both working." Naomi further testified about Amos's signature, stating that "he wrote big" as he "moved his whole arm" when signing documents. Referring to the signature on one of the December 1987 deeds, Naomi told the court that she had "never seen a signature [by Amos] this small." She opined that there was "no way" that Amos "could have personally appeared before [Bernice Stone, the notary who notarized the 1987 deeds]" because he was in Detroit on the date the deeds were executed.[4]

Gordon Lewis ("Gordon"), another of Amos's surviving offspring, told the court that "after [his] mother died" in October 1986, "to [his] knowledge," his father never "c[a]me to the District of Columbia again." William testified that while the signatures on the deeds "appear[] to be similar to [his] father's signature, . . . [they are] not [his] father's handwriting." William explained that his father "wrote big." William also told the court that Amos "wasn't [in the District of Columbia] on those dates [December 7 and 8, 1987] to sign that signature" and instead "was in Detroit."

---

[4] Plaintiffs/appellants advised the court that, reportedly, Ms. Stone died in 2013.

Esther testified that after her father got sick, she and William attempted to get him moved from a hospital in Detroit to a hospital in the District of Columbia but were unable to successfully move him because "he wasn't able to travel" between 1987 and 1991. She further stated that the signatures on the December 7 and December 8, 1987, deeds "do[] not appear to be [Amos's] signature" and that "[i]t was . . . impossible for [her] father to be [in the District] during that time."

The trial court announced its verdict with respect to the Quebec Place property on December 8, 2015. The court explained that, in reaching its verdict, it gave little weight to trial testimony recounting statements that family members purportedly made about who owned or would own the property. Rather, the court stated, the "real key to th[e] case . . . [wa]s the examination of the signatures" on the deed and "the question of whether plaintiffs ha[d] proven by clear and convincing evidence that Amos Lewis was not in the District of Columbia on December 7th and 8th of 1987." The court found that plaintiffs/appellants had not met their burden of showing by clear and convincing evidence, or even by a preponderance of the evidence, that the December 8 deed, bearing a notarization that carries a presumption of validity, was fraudulently executed.

The court compared the signatures on the December 7 and December 8 deeds with a known signature of Amos. Emphasizing that "there [was] no evidence from an expert document examiner or handwriting expert regarding the signatures," the court determined that "from looking at the signatures, . . . one could [not] conclude that the signatures [we]re forged." The court also explained its reasoning with respect to the testimony from the Lewis children that Amos "came to Michigan in August or thereabouts in 1987 and never left and wasn't able to leave." The court explained that while it did not "doubt the sincerity of the testimony," "the passage of time . . . changes people's memories." The court found that there was nothing in the testimony of the Lewis children about any particular events "that would make it stand out vividly in the minds of the plaintiffs or their sister to really identify the exact dates when [Amos] came to Michigan and stayed there." The court further noted that "missing from [plaintiffs'/appellants'] evidence [wa]s any kind of medical records or any other documentation showing exactly when Amos Lewis suffered . . . the first of the series of strokes that he received."

The court stated that it was unable to conclude by a preponderance of the evidence, and "certainly" not "by clear and convincing evidence," either that Amos "was in Detroit and not in the District of Columbia on December 7th and

December 8th" when the deeds were signed, or that the deeds were forged. Finding that the December 8, 1987, deed was not fraudulent, the court ruled that the Quebec Place property belonged to the estate of Robert A. Lewis.[5]

This appeal followed. Appellants contend (1) that "the preponderance of the evidence should not have led to the trial court's conclusion that the [d]eed(s) were not forgeries" and (2) that because "the issues of the fraudulent conveyance are more legal in nature than equitable in nature," the court wrongfully denied their request for a jury trial.

## II.

In our review of a judgment following a bench trial, we "may review both as to the facts and the law, but the judgment may not be set aside except for errors of law unless it appears that the judgment is plainly wrong or without evidence to support it." *In re Estate of Sato*, 878 A.2d 1247, 1250 (D.C. 2005) (quoting D.C.

---

[5] The court's ruling that the deed was not fraudulent also resolved the unjust enrichment and wrongful withholding of estate assets claims, which were premised solely on the claims that "[t]he [d]eeds . . . were . . . forged," "the properties were never deeded to" Robert A. Lewis, and the estate of Robert A. Lewis "has been unjustly enriched by claiming a 100% interest in the properties." As the court explained, "all of the claims brought in this [case] are predicated upon the assertion . . . that the father's signature on the two deeds in question w[as] forged."

Code § 17-305 (a) (2001)).  "Under this standard of review, we view the evidence in the light most favorable to the prevailing party, and we defer to the trial court's credibility determinations unless they are clearly erroneous."  *Ross v. Blackwell*, 146 A.3d 385, 387 (D.C. 2016) (internal citation, quotation marks, and brackets omitted).

"[T]here is a presumption that a deed is what it purports to be on its face, and one who seeks to establish the contrary [e.g., that the deed was forged] has the burden of doing so by clear and convincing evidence."  *Moore v. Deutsche Bank Nat'l Tr. Co.*, 124 A.3d 605, 609 n.5 (D.C. 2015) (quoting *In re Estate of Munawar*, 981 A.2d 584, 587 (D.C. 2009)); *see also id.* at 609 (considering, in determining whether the appellant's evidence was clear and convincing, whether it compelled the inference the appellant asserted should be drawn, and whether alternative inferences were possible).  "Clear and convincing evidence is 'evidence that will produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established.'"  *Id.* at 609 n.5 (quoting *Lumpkins v. CSL Locksmith, LLC*, 911 A.2d 418, 426 n.7 (D.C. 2006)).  Whether evidence meets the clear-and-convincing standard is a question of law that we review *de novo*.  *See In re Pelkey*, 962 A.2d 268, 278-79 (D.C. 2008).

Similarly, "to overcome the presumption arising from [a notary's] certificate there must be proof of gross concurrent mistake or fraud, through strong and disinterested evidence." *Marden v. Hopkins*, 47 App. D.C. 202, 206-07 (D.C. 1918) (endorsing the rule that even "[t]he unsupported testimony of a party to a deed, that he did not execute it, shall not prevail over the official certificate of the officer taking the acknowledgment" (internal quotations marks omitted)).

## III.

We are satisfied that appellants' evidence, though it raised questions about whether Amos signed the deed conveying the Quebec Place property, "did not compel an inference" that the deed was signed by someone else. *Moore*, 124 A.3d at 609. Rather, as the trial court reasoned, Amos might have signed the deed in a way smaller than his usual signature in order to fit it in the space provided, and, as the court correctly observed, some of Amos's known signatures were "virtually the same size" as the ones on the December 1987 deeds. The record also supports the trial court's observation that Naomi and Gordon "did not necessarily say that looking at the signatures [on the deed] that there was anything odd about them." Further, the trial court noted that plaintiffs/appellants had not offered expert testimony about the signatures on the deeds, a particularly glaring omission given

that they had named a "forensic document examination" expert in their Super. Ct. Civ. R. 16 (b) expert witness disclosure. Also as the court reasoned, the witnesses may have been mistaken about the dates of Amos's strokes and the date when he last traveled to the District of Columbia, especially given that nearly thirty years has passed between their testimony and the developments they recounted, and given that plaintiffs and their witnesses offered no medical records or other documentary evidence (other than a *1992* guardian *ad litem*'s report concluding that Amos was wheelchair bound and physically disabled) to support their recollections. Contrary to appellants' contention, the trial court did not need specific "evidence . . . that the memory and recall of Naomi . . . w[ere] flawed" to take into account that "[m]emories fade, particularly when, at the time, the [witness] had no reason to recall or record the information." *Weakley v. Burnham Corp.*, 871 A.2d 1167, 1177 (D.C. 2005); *see also Lemon v. United States*, 564 A.2d 1368, 1379 (D.C. 1989) ("The fact that memories fade is one of the major reasons for the constitutional guarantee of a speedy trial.").

In sum, plaintiffs'/appellants' evidence at trial was not the "strong and disinterested evidence," *Marden*, 47 App. D.C. at 206-07, that was necessary to compel the trial court to rule that the December 8, 1987, deed was signed by

someone other than Amos notwithstanding the notary's certification to the contrary.

In contending that the court should not have concluded that the December 8, 1987, deed was valid, appellants cite other evidence that the trial court did not address in its findings: for example, what plaintiffs/appellants characterize as the "clear finding by the trial court that the Re-Recordation Certificate did not contain the signature of Amos W. Lewis, Jr. but was the signature of Robert A. Lewis"; the evidence of defects in the deed (i.e., according to appellants, the evidence that the phrase "[t]enants by the [e]ntirety" "had been scratched out and that the words [j]oint [t]enants were written over" the phrase, and the fact that "the legal description [in the deed] conveyed the wrong square and listed the lot number as the square"); evidence "that Robert A. Lewis expected his siblings to continue to pay the real estate taxes on the Quebec Place property and informed them that it was their duty to pay their share" even after execution of the December 8, 1987, deed; and testimony about the Lewis siblings' having contributed to paying taxes and renovation costs with respect to the Quebec Place property after 1987. Appellants complain that, to their detriment, "the trial court excluded [such] evidence in pre-trial hearings." They appear to be referring to the trial court's ruling in its September 8, 2015, pre-trial "Revised Scheduling Order" that

plaintiffs/appellants "may not pursue any claims regarding alleged defects in the execution of the deeds" and to the trial court's ruling from the bench the same day that assertions such as the foregoing were "not part of the lawsuit [appellants] brought in this case." The trial judge explained that if appellants wanted these issues to be a part of their case, they would "have to go back and move to amend the complaint," and that appellants "ha[d]n't done . . . that."

We reject appellants' argument that the court erred or abused its discretion in not considering the evidence described above in adjudicating their claim that the December 8, 1987, deed was invalid and that the estate of Robert A. Lewis was unjustly enriched and was wrongfully withholding estate assets. As described above, see *supra* note 5, all three counts of plaintiffs'/appellants' complaint were premised on the assertion that Amos's signature on the December 1987 deeds was forged.[6] Appellants did not move to amend their complaint to allege other grounds on which the deeds were defective or other grounds that might support a claim of unjust enrichment. Plaintiffs/appellants filed their complaint in November 2013,

---

[6] This case is unlike *Chen v. Bell-Smith*, 768 F. Supp. 2d 121 (D.D.C. 2011), on which appellants rely. There, even though one of the defendants was not mentioned in a count of the complaint, "the thrust of plaintiffs' Second Amended Complaint" was that that party participated in defrauding plaintiffs' out of their home, a point made clear "elsewhere in the[] complaint." *Id*. at 139.

and it was not until August 2015 — nearly two years after the complaint was filed, months after discovery had closed, only in opposition to the defendants' motion for summary judgment, and just before the parties filed their pre-trial statements — that they attempted to add claims that the deed was altered and otherwise defective,[7] and that a 100% interest in the Quebec Place property could not fairly have passed to Robert A. Lewis. The trial court did not erroneously exercise its discretion in ruling that it was "too late and two years down the pike to be doing that" in August 2015. *Cf. Han v. Se. Acad. of Scholastic Excellence Pub. Charter Sch.*, 32 A.3d 413, 417 (D.C. 2011) ("In light of the fact that appellant did not seek leave to amend her complaint until after the trial judge ruled on the motions for summary judgment, we hold the trial judge did not err[.]"). Thus, although appellants' brief asserts that "[h]ere, the focus is on whether a deed listing an incorrect lot and square . . . can be corrected by [Robert A. Lewis] signing [Amos's] name on a re-recordation document," the trial court did not err in

---

[7] Appellants' argument on this point is that "[t]he first deed conveyed nothing because the square was incorrect," that the Office of Tax and Revenue discovered the error and notified Amos that his purported conveyance was invalid, and that "[s]ix months later, someone other than Amos Lewis executed a corrected deed." They argue that "[b]ased on this record, . . . [i]t is irrelevant that the court found that the signature on the December 8, 1987 original deed was not a forgery because the original deed did not convey the property" and June 29, 1988, certificate correcting the Deed also "was a forgery and was void." But plaintiffs/appellants said none of this in their complaint.

focusing exclusively on whether plaintiffs/appellants had proven by clear and convincing evidence that Amos did not sign the December 1987 deeds. Even if, as appellants assert, the trial court credited the testimony that Amos was not in the District of Columbia in 1988 to sign the Re-Recordation Certificate and "that Robert A. Lewis signed the signature of Amos W. Lewis on the Re-Recordation Certificate for his convenience," that does not undermine the court's verdict on the issue that was properly before it: whether the December 8, 1987, deed was forged.[8]

## IV.

Lastly, appellants argue they were entitled to a jury trial. For the reasons that follow, we disagree.

---

[8] We note that it also is not clear that a Re-Recordation Certificate signed by Robert A. Lewis (if that is what occurred) for the convenience of himself and Amos would have been ineffectual. *Cf. Treglia v. Zanesky*, 788 A.2d 1263, 1269-70 (Conn. App. Ct. 2001) (considering, a case in which the plaintiff "gave permission to or granted authority to his father to sign his name on [a] deed of conveyance," whether "a deed of conveyance may be validly signed by a grantor's representative" who lacks a formal power of attorney; declining to adopt a bright line rule that, in that circumstance, the conveyance will be void).

To determine whether appellants were entitled to a jury trial, we must consider first whether the D.C. Code explicitly provides for a jury trial where plaintiffs seek to set aside a fraudulent conveyance, and second, whether the Seventh Amendment to the United States Constitution requires that a jury trial be afforded in such a case. *See In re Estate of Johnson*, 820 A.2d 535, 537 (D.C. 2003) ("look[ing] first to the D.C. Code and then the Constitution" to determine whether the appellant was entitled to a jury trial); *see also* Super. Ct. Civ. R. 38 (a) (stating that "[t]he right of trial by jury as declared by the Seventh Amendment to the Constitution—or as provided by an applicable statute—is preserved to the parties inviolate").

We are unable to find a specific statute that provides a right to a jury trial where, as here, the plaintiffs seek to set aside a fraudulent conveyance and made no claim for a money judgment.[9] "As such, we can only conclude that there is no statutory right in the District of Columbia to a jury trial" in a matter such as this. *Estate of Johnson*, 820 A.2d at 538. We therefore turn to the issue of whether a

---

[9] Nor could the trial court judge find a specific statute providing for a jury trial. ("As best I can tell, and we've done a lot of research, there's no specific statute that provides the right to a jury trial when there's a contest over . . . a transfer of property.")

jury trial was constitutionally mandated upon plaintiffs'/appellants' "request [for] a [t]rial by [j]ury."

The Seventh Amendment provides in pertinent part that "[i]n suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved." U.S. CONST. amend. VII. "The right to a jury trial extends not only to common-law forms of action, but also to subsequently created legal remedies in which legal, as distinguished from equitable, rights are at issue." *Estate of Johnson*, 820 A.2d at 538 (quoting *Johnson v. Fairfax Vill. Condo. IV Unit Owners Ass'n*, 641 A.2d 495, 505 (D.C. 1994)). "[W]here the issue in dispute is legal in nature a constitutional right to trial by jury attaches; where the issue, however, is equitable in nature there is not a constitutional right to a jury trial." *Id.* (quoting *E.R.B. v. J.H.F.*, 496 A.2d 607, 611 (D.C. 1985)). Thus, "[t]he Seventh Amendment question depends on the nature of the issue to be tried rather than the character of the overall action." *Id.* (quoting *Johnson*, 641 A.2d at 505). To determine whether an issue is legal or equitable, we must consider (1) custom "in the courts of England prior to the merger of the courts of law and equity," and, "more important," (2) the remedy sought. *Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 565 (1990) (internal quotation marks omitted); *see also Estate of Johnson*, 820 A.2d at 538-39 ("To determine

whether an issue is legal or equitable, we first compare the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity."). "[A]n action for money damages was the traditional form of relief offered in the courts of law." *Chauffeurs*, 494 U.S. at 570 (internal quotation marks omitted).

In this case, plaintiffs'/appellants' prayer for relief was that the trial court "[d]eclare and render the [d]eeds . . . as null and void," issue a "[d]eclaratory judgment restoring title to the properties back in the name of Amos W. Lewis, Jr.[,] the rightful owner of said properties," and award "[a]ny and all relief that the [c]ourt deems just and proper." The fact that plaintiffs/appellants did not seek money damages weighs in favor of a conclusion that this is an action at law for which no jury trial was required. The same conclusion follows from plaintiffs'/appellants' prayer that the court grant such relief as it deemed "just and proper." Such a prayer "was a direct appeal to the court's equity power to fashion any remedy necessary to satisfy the ends of justice." *In re Graham*, 747 F.2d 1383, 1388 (11th Cir. 1984) (citing *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944)). And, as discussed below, this conclusion also follows from a consideration of how such an action would have been handled "in the courts of

England prior to the merger of the courts of law and equity." *Chauffeurs*, 494 U.S. at 565 (internal quotation marks omitted).

As appellants acknowledge, the crux of their lawsuit consisted of allegations that the Quebec Place and North Capitol properties were fraudulently conveyed through forged deeds and a request that the trial court set aside those conveyances. They assert that "the issues of the fraudulent conveyance are more legal in nature than equitable in nature," but case law does not support that position. "Contrary to appellants' assertion, . . . the English equity and law courts exercised concurrent jurisdiction over fraudulent conveyance actions; the law courts tried those in which the creditor sought legal remedies and the equity courts tried those in which he sought equitable remedies." *In re Graham*, 747 F.2d at 1387 (noting that "the courts of this country have long held that an action by a creditor or trustee-in-bankruptcy to set aside a fraudulent conveyance is an equitable action," as to which there is no right to trial by jury, "while an action by a creditor or trustee-in-bankruptcy seeking money damages is an action at law"); *see also Mississippi Mills v. Cohn*, 150 U.S. 202, 206-07 (1893) (determining that where the creditor's prayer was that the husband "be declared the real owner of the properties described," and not the wife, to whom they had been fraudulently conveyed by the husband, the suit was "within the jurisdiction[] of equity"); *Howard v. Stanolind*

*Oil & Gas Co.*, 169 P.2d 737, 741 (Okla. 1946) ("It is well settled that an action, the primary purpose of which is to set aside deed conveying real estate and [to] obtain[] a decree reinvesting title in plaintiff, is one of equity and in such action neither party is entitled to a jury."); *cf. Estate of Johnson*, 820 A.2d at 539 (concluding that there is no right to a jury trial in a will contest action where the remedy sought is to set aside or rescind the will).[10]

Because plaintiffs/appellants commenced this action as an action to set aside an allegedly fraudulent conveyance, the trial court did not err in ruling that plaintiffs/appellants were not entitled to a jury trial.[11]

---

[10] Another reason why the court's decision should be reversed, appellants' argue, is that the judge entered his decision without written findings of fact after he struck the jury demand. However, there is no requirement (as there is in some divisions of the Superior Court, *see, e.g.*, Super. Ct. Dom. Rel. R. 52 (a)) that the Probate Division issue written findings of fact or conclusions of law. Super. Ct. Civ. R. 52 (a)(1) provides that the trial court's findings of fact and conclusions of law "may be stated on the record."

[11] Appellants argue that "[t]he trial court's intended conversion of the real properties to liquid assets and the subsequent claims for money damages that would obviously attach provide further support for [a]ppellants' position that a trial by jury applies" since "[i]n reality, the parties would be reduced to seeking claims for money." However, it is of no moment that, by the time of trial, the Quebec Place property had been ordered to be sold, because a suit that "beg[ins] wholly in equity [is] not transformed into one partially at law by later events that ma[k]e monetary relief appropriate." *Whitlock v. Hause*, 694 F.2d 861, 866 (1st Cir. 1982) (citing *Crane Co. v. Am. Standard, Inc.*, 490 F.2d 332, 342 (2d Cir. 1973)).

Finally, appellants argue that defendants'/appellees' counterclaims "called for a trial by jury." The counterclaims sought an order requiring the defendants/appellants "to return all the items of personal property [allegedly belonging to Robert A. Lewis and which defendants/appellants allegedly] removed or had removed from [the Quebec Place and North Capitol] Properties," an order requiring an accounting, and "such other and further relief as may be just and reasonable." For the same reasons discussed above (i.e., that the requested relief was not money damages but instead a reconveyance of allegedly converted property and a prayer in equity for any other relief the court deemed "just and proper"), plaintiffs/appellants were not entitled to a jury trial because of the counterclaims.

## V.

For the foregoing reasons, the judgment of the Superior Court is

*Affirmed.*