*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 17-FM-1394

BRIAN GILL, APPELLANT,

V.

RODNEY VAN NOSTRAND, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
DRB-1774-14

(Hon. Robert Okun, Trial Judge)

(Argued February 14, 2019                    Decided April 25, 2019)

*Aaron Marr Page*, with whom *Christopher J. Gowen* was on the brief, for appellant.

*Jack Maginnis* for appellee.

Before THOMPSON, EASTERLY, and MCLEESE, *Associate Judges*.

THOMPSON, *Associate Judge*:    Plaintiff/appellant Brian Gill and defendant/appellee Rodney Van Nostrand were in a romantic relationship and cohabited for several years beginning in 2004. After their romantic relationship waned, and a few months after Mr. Van Nostrand had a ceremonial wedding in Brazil to another man he had met while on a lengthy work assignment in that

country, Mr. Gill filed a complaint for legal separation from Mr. Van Nostrand, alleging that the two men are parties in a common law marriage that began in 2004.[1] Mr. Gill also sought alimony and a distribution of marital property. Mr. Van Nostrand denied that he and Mr. Gill had entered into a common law marriage. The matter was tried in the Superior Court over several days in June and July 2017. In its post-trial decision that we are asked to review, the trial court recognized that same-sex common law marriages are lawful in the District of Columbia and referred to its prior ruling in the case "that a party in a same-sex relationship must be given the opportunity to prove a common law marriage, even at a time when same-sex marriage was not legal . . . ." The court concluded, however, that Mr. Gill had failed to prove by clear and convincing evidence the existence of a common law marriage between him and Mr. Van Nostrand. The court therefore dismissed Mr. Gill's complaint.

In this appeal, Mr. Gill does not take issue with the trial court's description of what he was required to prove in order to prevail on his claims: "that he and [Mr. Van Nostrand] made a commitment to each other, in the present tense, that

---

[1] Mr. Gill told the court that if it found that a common law marriage existed between the parties, he would amend his complaint to seek divorce rather than legal separation.

was comparable to the commitment that parties make to each other in ceremonial marriages." Mr. Gill asserts, however, that the trial court erred by unconstitutionally "[r]equiring the parties' . . . agreement and relationship to meet expectations of form, custom, and marital consciousness drawn from the very institution of traditionally-conceived marriage from which they were excluded" before the Supreme Court's decision in *Obergefell v. Hodges*.[2] Mr. Gill also argues that the trial court's assessment of the parties' relationship "was affected by prejudicial assumptions and expectations." He further asserts that the trial court "provided no room for the different forms that a 'marriage' agreement occurring in the shadow of the institution might take . . . ." He characterizes the trial court's reasoning as "an insult to the seriousness of same-sex relationships," and contends that the trial court gave inadequate consideration to the parties' "commitment, intimacy, shared responsibility, and . . . vision of [the] permanence" of their relationship.

Because we are satisfied that the record does not support Mr. Gill's characterization of the trial court's ruling, and because the evidence did not compel the trial court to conclude that the parties made an express mutual commitment to

---

[2] 135 S. Ct. 2584, 2604–2605 (2015) (holding that "same-sex couples may exercise the fundamental right to marry").

each other that was comparable to the commitment parties make to each other in a ceremonial marriage, we affirm.

## I.

In *Obergefell*, the Supreme Court held that same-sex couples may not be deprived of the fundamental right to marry and that state laws that "exclude same-sex couples from civil marriage on the same terms and conditions as opposite-sex couples" violate the Due Process and Equal Protection Clauses of the Constitution and are therefore invalid. 135 S. Ct. at 2602–03, 2604–05. This court similarly has recognized that a law that would deny the right to marry to "individuals who are partners to a same-sex rather than opposite-sex union . . . . would take away from those individuals a civil right" and would "authorize discrimination on the basis of sexual orientation" in violation of the District of Columbia Human Rights Act. *Jackson v. District of Columbia Bd. of Elections & Ethics*, 999 A.2d 89, 118–119 (D.C. 2010) (en banc); *see also* D.C. Code § 46-401(a) (2012 Repl.) (providing, effective March 3, 2010, that "[a]ny person may enter into a marriage in the District of Columbia with another person, regardless of gender").

"[T]he District of Columbia has long recognized common law marriages." *Mesa v. United States*, 875 A.2d 79, 83 (D.C. 2005) (internal quotation marks omitted); *see also Nat'l Union Fire Ins. Co. v. Britton*, 187 F. Supp. 359, 363 (D.D.C. 1960) (stating that common-law marriages and ceremonial marriages "are equally lawful, solemn, and binding"), *aff'd*, 289 F.2d 454 (D.C. Cir. 1961) (per curiam). We now expressly recognize, as the trial court did and as *Obergefell*, *Jackson*, and § 46-401(a) require, that a same-sex couple may enter into common-law marriage in the District of Columbia and that this rule applies retroactively. Thus, the trial court was correct in ruling that "a party in a same-sex relationship must be given the opportunity to prove a common law marriage, even at a time when same-sex marriage was not legal . . . ."

As articulated in numerous pre-*Obergefell* decisions of this court, "[t]he elements of common law marriage in this jurisdiction are cohabitation as husband and wife, following an express mutual agreement, which must be in words of the present tense." *Coleman v. United States*, 948 A.2d 534, 544 (D.C. 2008) (internal quotation marks); *see also Coates v. Watts*, 622 A.2d 25, 27 (D.C. 1993) ("Although there is no set formula required for the [express mutual] agreement, the exchange of words must inescapably and unambiguously imply that an agreement was being entered into to become man and wife as of the time of the mutual

consent.") (internal quotation marks omitted). Adhering to *Obergefell* and *Jackson*, we now restate the elements of common law marriage as follows: cohabitation following an express mutual agreement, which must be in words of the present tense, to be permanent partners with the same degree of commitment as the spouses in a ceremonial marriage. Echoing *Coates*, we declare that "[a]lthough there is no set formula required for the [express mutual] agreement, the exchange of words must inescapably and unambiguously imply that an agreement was being entered into to become [permanent partners with the same degree of commitment as the spouses in a ceremonial marriage] as of the time of the mutual consent."[3] *Coates*, 622 A.2d at 27 (internal quotation marks omitted). An agreement "to be married at an unspecified future time . . . . is insufficient to establish the existence of a common law marriage . . . ." *Id.*; *see also Cerovic v. Stojkov*, 134 A.3d 766, 776 (D.C. 2016) ("Being engaged, by itself, does not constitute a common law marriage, but rather may signify an intention to marry.").

---

[3] We do not say "to be husband and husband" or "to be husbands" because Mr. Gill asserts that he and Mr. Van Nostrand would not have used the term "husband." Mr. Gill also objects to any analysis that requires the parties to have used the term "married," because it was "a term . . . that didn't exist in [their] heads, as well as legally."

"The best evidence of [the requisite present-tense express mutual] agreement is the testimony of the parties." *United States Fid. & Guar. Co. v. Britton*, 269 F.2d 249, 252 (D.C. Cir. 1959). In some circumstances, however, the existence of the required mutual agreement "may be inferred from the character and duration of cohabitation, or from other circumstantial evidence such as testimony by relatives and acquaintances as to the general reputation regarding the parties' relationship." *Mesa*, 875 A.2d at 83.

Ordinarily, "a party alleging a common-law marriage need prove it only by a preponderance of the evidence." *East v. East*, 536 A.2d 1103, 1106 (D.C. 1988). However, where there is a claim that a common-law marriage preceded a ceremonial marriage between one of the parties to the putative common law marriage and a third person,[4] the party asserting the common law marriage must overcome the legal presumption that the more recent, ceremonial marriage is valid. *Id.* at 1105. This presumption is "one of the strongest [presumptions] in the law,"

---

[4] We recognize Mr. Van Nostrand's ceremonial marriage in Brazil as a matter of comity, i.e., "the recognition which one nation allows within its territory to the legislative, executive, or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws." *Cerovic*, 134 A.3d at 782 (internal quotation marks omitted).

*id.* (internal quotation marks omitted), and represents a "social policy in favor of reaching a particular result in the close or doubtful cases." *Mayo v. Ford*, 184 A.2d 38, 41 (D.C. 1962) (internal quotation marks omitted). The presumption of the validity of a later-in-time ceremonial marriage can be rebutted only by "strong, distinct, satisfactory, and conclusive evidence." *Id.* (internal quotation marks omitted). That is, "to overcome the presumption of the validity of [a] later marriage[,] the proponent of the prior, common law marriage must prove its existence by clear and convincing evidence." *Cerovic*, 134 A.3d at 775 (internal quotation marks omitted). "Clear and convincing evidence is evidence which will produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established. . . ." *In re Ta.L.*, 149 A.3d 1060, 1084 (D.C. 2016) (en banc) (plurality opinion) (internal quotation marks omitted). In short, the party seeking to prove the existence of a prior, non-dissolved common law marriage where there has been a subsequent ceremonial marriage, bears a "heavy burden." *Johnson v. Young*, 372 A.2d 992, 994 (D.C. 1977).

More generally (*e.g.*, even when there is no subsequent ceremonial marriage), we have said that "claims of common law marriage should be closely scrutinized." *Cerovic*, 134 A.3d at 776 (internal quotation marks omitted). This is especially so if ceremonial marriage, which "provides unequivocal proof" that the

parties are married, "is readily available." *Coates*, 622 A.2d at 27; *Bansda v. Wheeler*, 995 A.2d 189, 198 (2010) ("Since ceremonial marriage is readily available and provides unequivocal proof that the parties are [spouses], claims of common law marriage should be closely scrutinized . . . .") (alteration and internal quotation marks omitted). One sound reason for courts to be skeptical of claims of common-law marriage is that "experience reveals that many who believe themselves to be 'common-law' married have had one or more previous 'common-law' relationships without the benefit of divorce." *McCoy v. District of Columbia*, 256 A.2d 908, 910 (D.C. 1969).

Nevertheless, because ceremonial marriage between same-sex couples was not available in the District of Columbia prior to enactment of § 46-401(a) in 2010, it arguably would be appropriate to apply the "close[] scrutin[y]" described above only to a review of what transpired between the parties to a same-sex (putative) common-law marriage after that enactment date.[5] And, somewhat conversely, although *Obergefell* did not identify the applicable level of scrutiny when marriage

---

[5] *Cf. In re Estate of Carter*, 159 A.3d 970, 978, 980 (Pa. Super. Ct. 2017) (reasoning that "when assessing claims of common law marriage, context matters, and general notions of hostility [to common-law marriage as a 'fruitful source of perjury and fraud'] need not always dictate the outcome" when a same-sex relationship is involved).

laws are applied to same-sex couples, it might be appropriate to apply a rigorous review, "if not quite 'strict scrutiny,'"[6] to any judicial analysis that impinges upon or "substantially"[7] or "'significantly interfere[s]' with"[8] the ability of same-sex partners to exercise the fundamental right to marry.[9] We shall assume *arguendo* that serious constitutional issues would arise if the trial court's analysis of common-law marriage operated to the peculiar disadvantage of Mr. Gill and Mr. Van Nostrand as a same-sex-couple, i.e., required them to meet expectations that they as a same-sex couple could meet only with more difficulty than opposite-sex couples would encounter. Such an approach is arguably warranted in order to accord same-sex couples who have chosen to share their lives in a union comparable to traditional marriage "the same respect and dignity accorded a union

---

[6] *Ezell v. City of Chicago*, 651 F.3d 684, 708 (7th Cir. 2011); *see also Herrington v. United States*, 6 A.3d 1237, 1242 n.17 (D.C. 2010) (stating that impingement on a fundamental right "may mean that 'strict scrutiny' of any substantial restriction is mandated").

[7] *Smith v. Shalala*, 5 F.3d 235, 239 (7th Cir. 1993).

[8] *Bostic v. Schaefer*, 760 F.3d 352, 377 (4th Cir. 2014) (quoting *Zablocki v. Redhail*, 434 U.S. 374, 386 (1978)).

[9] *Cf. Opinions of the Justices to the Senate,* 802 N.E.2d 565, 577 n.3 (Mass. 2004) (separate opinion by Sosman, J.) (recognizing that "some provisions [of law] may need substantial modification merely in order to make sense in their application to same-sex couples").

traditionally designated as marriage." *Strauss v. Horton*, 207 P.3d 48, 71 (Cal. 2009) (internal quotation marks omitted).

We have said that whether there is a common law marriage is "*largely* a factual determination," *Mesa*, 875 A.2d at 83 (emphasis added), meaning that it is a mixed question of fact and law. *Compare East*, 536 A.2d at 1106 ("The trial court found that there was a present verbal agreement to be married on October 31, 1977. In the 'Findings of Fact' section of its order, the court recited the contradictory evidence concerning that agreement, and in its 'Conclusions of Law' the court resolved this conflict in favor of Margaret East. Although this resolution appears in the 'Conclusions of Law' section of the order, it is really a finding of fact."), *with Gardner v. Gardner*, 233 F.2d 23, 25 n.3 (D.C. Cir. 1956) (referring to the finding that "no common law marriage exists" between the parties as "perhaps more accurately [a] conclusion[] of law"), *and Renshaw v. Heckler*, 787 F.2d 50, 54 (2d Cir. 1986) ("[T]he question as to whether a person has been legally married to another is a mixed question of law and fact for the purpose of review . . . ."). The trial court's resolution of conflicting factual evidence must be affirmed unless "it is plainly wrong or without evidence to support it." *East*, 536 A.2d at 1106. But "[w]hether evidence meets the clear-and-convincing standard is a question of

law that we review *de novo*." *Lewis v. Estate of Lewis*, 193 A.3d 139, 144 (D.C. 2018); *see also Hipps v. Cabrera*, 170 A.3d 199, 205 n.7 (D.C. 2017).[10]

## II.

In its order that is before us for review, the trial court summarized each party's account of what happened "in or about" June 2004, when, as the complaint alleges, Mr. Gill proposed to Mr. Van Nostrand. According to Mr. Gill, that is when the parties made their express, mutual commitment that ripened or transformed their relationship into a common-law marriage. As the court recounted, Mr. Gill testified that he decided to surprise Mr. Van Nostrand by purchasing two rings and presenting them to Mr. Van Nostrand along with M&M candies inscribed with "Will you marry me?" Mr. Gill then got down on one knee and asked Mr. Van Nostrand if he would marry him. According to Mr. Gill, Mr.

---

[10] Mr. Gill suggests in his reply brief that a preponderance-of-the-evidence standard, rather than the clear-and-convincing standard, should apply in this case because, *inter alia*, Mr. Van Nostrand "chose to go through with [the subsequent ceremonial marriage] *after* having been put on notice of [Mr. Gill's] claim of [common law marriage] . . . ." By making this argument only in his reply brief, Mr. Gill did not properly preserve it for review, and we therefore do not address it. *See Aeon Fin., LLC v. District of Columbia*, 84 A.3d 522, 530 (D.C. 2014) ("It is the longstanding policy of this court not to consider arguments raised for the first time in a reply brief.") (brackets and internal quotation marks omitted).

Van Nostrand said "yes," and Mr. Gill placed one of the rings on the ring finger of Mr. Nostrand's left hand. For his part, Mr. Van Nostrand denied Mr. Gill's account of a down-on-one-knee proposal. Mr. Van Nostrand explained that soon after the parties started living together, he learned to his displeasure that Mr. Gill was having sexual relations with another man. The couple then agreed "after much discussion" to have a monogamous relationship and went ring shopping in May 2004 (but did not purchase rings). According to Mr. Van Nostrand, Mr. Gill later bought rings and presented them along with the inscribed M&Ms, but told Mr. Van Nostrand that the two should wear the rings to show that they were in a monogamous relationship, and that, when they decided to get married at some point in the future, they each would inscribe and exchange the rings.[11] There is no dispute that the two men wore the rings from that point on, "with occasional interruptions during difficult times in the relationship, until some point in 2013."

---

[11] Mr. Gill complains that the trial court "rush[ed] to embrace" Mr. Van Nostrand's story about a proposed future ring exchange as necessary to consecrate the parties' marriage because Mr. Nostrand's account "corresponds somewhat more closely with traditional forms, customs, and conceptions of marriage." Mr. Gill asserts that the court did so even though Mr. Van Nostrand's story was not corroborated and was "contradicted" by friend and witness Troy Liston. We do not perceive from the record that the court "rush[ed]" to credit Mr. Van Nostrand's testimony, but we do note that Mr. Gill invites us to draw conclusions from the traditional customs of marriage. He argues that treating what occurred in June 2004 as merely a marriage proposal "is inconsistent with the involvement of two gold bands rather than one engagement ring . . . ."

The trial court said that it would assume *arguendo* that Mr. Van Nostrand said "yes" to Mr. Gill's proposal even though it could not find that this was proven clearly and convincingly. The court then listed a number of findings, addressed more fully in the court's "Conclusions of Law," that were pertinent to the court's main inquiry: whether, as Mr. Gill claimed, "the parties entered into an express mutual agreement to be married as on the date when [Mr. Gill] gave [Mr. Van Nostrand] a ring and proposed to him" or "subsequently enter[ed] into an express mutual [present-tense] agreement to be married."[12] The court found that the parties did not do so at either time.

The trial court listed several reasons for its conclusions. Below, we describe the court's reasoning and pause after each reason to consider whether, as Mr. Gill claims, the court's reasoning "requir[ed] the parties' . . . agreement and relationship to meet expectations of form, custom, and marital consciousness drawn from the very institution of traditionally-conceived marriage from which they were excluded" and was "affected by prejudicial assumptions and expectations."

_____

[12] Mr. Gill acknowledged in the trial court that "[t]he 'present tense' requirement remains . . . ."

The first reason the court cited is that "neither party even remembered the date" in 2004 when, according to Mr. Gill, they married. The court described Mr. Gill's testimony on this point as "exceptionally vague." "At times, [Mr. Gill] said he did not remember the date of the marriage, at other times he said the marriage occurred in June 2004, and at other points, he said the marriage occurred in the summer of 2004" or "in '2004, I believe.'" By contrast, the trial court noted, Mr. Gill remembered the date of the couples' first date and the date when the couple first met and had sexual relations. The court reasoned that "the date on which parties agree to be married surely would be at least as memorable [as], if not more memorable . . . than[,] the date on which" the parties first had sexual relations "or first had a 'real date' at a restaurant."

Mr. Gill criticizes the court's "overreliance" on his failure to remember the precise date. He further asserts that it was prejudicial for the court to require from him a better memory of the date when — unlike opposite-sex couples who "encountered [their marriage] date 10,000 times while booking reservations, preparing invitations, and the like" — ceremonial marriage was foreclosed to him and Mr. Van Nostrand in 2004. We are not persuaded that the court's reliance on

this factor was unfairly prejudicial or required the parties to meet expectations of traditional marriage that they, as a same-sex couple, could meet only with difficulty. The date Mr. Gill identifies as the date when the parties' common law marriage began was also, at the very least, the date of Mr. Gill's proposal to Mr. Van Nostrand. Mr. Gill has not suggested why it is more difficult for him as a gay man to remember the date when he proposed marriage and received a "yes" in return than it would be for a person who is part of an opposite-sex couple. In any event, we do not view the trial court's reliance on Mr. Gill's inability to remember the date of the alleged marriage as reflecting an unfair or unreasonable factor to consider in determining whether there was a same-sex common-law marriage. Knowledge of the date of the claimed agreement between the parties was a legitimate, albeit not dispositive consideration, and we do not discern any bias against same-sex couples reflected in the court's consideration of that factor in this case.

The second reason the court highlighted was that neither party told their friends or family about the alleged marriage (or perhaps more correctly, the alleged "entry into a commitment comparable to marriage") and the couple did not

commemorate it with a ceremony or celebrate it by going on a honeymoon.[13]  Mr. Gill asserts that it was unfair to require the parties' to "meet expectations of . . . custom" drawn from the institution of traditional marriage from which he and Mr. Van Nostrand were excluded.  The record supports Mr. Gill's assertion that the parties' families had "harsh anti-gay views" at least in the early days of the parties' relationship that explain why the couple might not have immediately told their families about their (claimed) new status.  We note, however, Mr. Gill asserted in his complaint that he and Mr. Van Nostrand "shared th[e] information [about their alleged marriage in 2004] with friends and family," thus at least arguably inviting the trial court to focus on this factor.

In any event, the trial court "acknowledge[d] that same-sex couples, prior to the legalization of same-sex marriage, might have been less likely to have a public ceremony or honeymoon than [opposite-sex] couples who could legally celebrate their wedding[.]"  The court's focus, therefore, was not on how opposite-sex couples have traditionally celebrated and commemorated marriage, but instead on the evidence that was presented about how *these parties* and their friends in the

---

[13]     Mr. Gill testified that the couple honeymooned when they traveled to Florence and Paris in November 2005.  The trial court credited Mr. Van Nostrand's testimony that this trip "was not a honeymoon."

gay community marked or signified important events in their romantic lives. As the trial court observed, both parties testified about Mr. Van Nostrand's preference for "celebrat[ing] events in a flamboyant manner." The court noted that when Mr. Van Nostrand proposed to Weller da Silva, the Brazilian man he subsequently married ceremonially (in April 2014), Mr. Van Nostrand delivered the proposal while the pair were in a hot-air balloon over the Serengeti, created an album commemorating the proposal, told family members and friends, met Mr. da Silva's family, and, after the two were married, went on a honeymoon trip to Ecuador and the Galapagos Islands.[14] Mr. Gill makes the valid point that the contrast between Mr. Van Nostrand's decision to tell his family about his marriage to Mr. da Silva in 2014, but not about the (putative) marriage to Mr. Gill, can be attributed to the change (by 2014) in public perception attendant to the legalization of same-sex marriage. But the trial court specifically credited Mr. Van Nostrand's testimony that "he would not have entered into a marriage with [Mr. Gill] without commemorating such an event with . . . pomp and circumstance . . . ." In addition, there was abundant record evidence of Mr. Van Nostrand's financial ability to travel, and of his and Mr. Gill's shared history of foreign travel. Further, the court

---

[14] By contrast, Mr. Van Nostrand testified, neither he nor Mr. Gill created any memorabilia with respect to any landmarks or milestone in their relationship because "[t]here weren't any landmarks or milestones to memorialize."

heard testimony that some of the parties' friends who were same-sex couples had public commitment ceremonies or got married in Massachusetts (steps that were available to the parties, too, even though ceremonial marriage in the District of Columbia was not available to them before 2010).  For that reason, the trial court was not compelled to find, as Mr. Gill asserts in his brief to us, that the parties' wearing "gold bands on their left ring fingers" informed friends and family about the parties' (alleged) new relationship "in the most culturally salient manner possible."

It was reasonable for the trial court to infer that if Mr. Van Nostrand had agreed to a present commitment comparable to marriage in 2004, he would have commemorated it in a big way, notwithstanding that same-sex marriage was not lawful in the District of Columbia at that time.  We are satisfied that the trial court's reliance on whether the parties told their friends about the alleged marriage or commemorated it in a special way did not amount to unfairly requiring *these* parties to "meet expectations of . . . custom" drawn from the institution of traditional marriage from which they were excluded.

The third reason the court listed is that the parties never inscribed their rings (a step that might have signified that their relationship had progressed from an engagement to a commitment comparable to marriage). The trial court credited Mr. Van Nostrand's testimony that he would not have considered himself married to Mr. Gill until the couple had commemorated their relationship in that manner[15] and that the parties intended to inscribe the rings if they were to get married. The court also found that Mr. Gill refused when Mr. Van Nostrand later asked him if he wanted to get married in Massachusetts, where same-sex marriage was legal; refused when Mr. Van Nostrand suggested that they inscribe and exchange the rings; and also declined to enter into a formal domestic partnership with Mr. Van Nostrand. The trial court therefore had ample basis to discredit Mr. Gill's testimony that he and Mr. Van Nostrand "attempt[ed] to be as married as we could."

Mr. Gill argues that the court's reliance on whether the parties inscribed their rings, married in Massachusetts, or entered a domestic partnership, amounted to making the determination of whether the parties had a common-law marriage

---

[15] As noted above, Mr. Van Nostrand testified that the rings signified that the two men were in a monogamous relationship and that "[t]here had never been any conversation that we were even married, nothing."

"turn on the extent to which the couple chose to mimic the traditional forms of the institution of marriage." We agree that such an approach would be questionable, but we do not agree that this is the approach the trial court took.[16] The court took its lead not from opposite-sex marriage traditions, but from what Mr. Van Nostrand described as the steps *he* would have taken to symbolize and validate that the parties' relationship had advanced to a mutual commitment comparable to marriage. The court's approach was not inappropriate, because "if one party to a purported common law marriage believes she is married, but the other party does not, a marriage cannot be established." *Hogsett v. Neale*, No. 17CA1484, 2018 Colo. App. LEXIS 1820, at *20 (Colo. App. 2018); *see also id.* at *4, *21 (concluding that even though "many indicia of a marriage were present, including the parties' intertwined finances, the existence of joint accounts, . . . their joint ownership of a home" and an exchange of rings, there was no common law marriage where the court weighed "heavily" "the absence of conduct showing an attempt to be married in a state where same-sex marriage was legal" and "found

---

[16] Further, the record provides no support for Mr. Gill's suggestion that the parties were "hostile" to the institution of marriage that had excluded them, may not have wanted to "venerate an institution that refused to accept them," or "felt uncomfortable at the notion of jumping too hastily at an institution that had rejected them for so long."

credible Hogsett's belief that she was married to Neale, [but] also found credible Neale's belief that she was never married to Hogsett").[17]

The fourth factor the court emphasized was that the parties maintained largely separate finances. The court noted that the house into which the parties moved in 2005 was titled solely in Mr. Van Nostrand's name. The court further noted that for most of the years when the parties were together, they had no joint bank account or joint credit card account, having opened a joint checking account and a joint American Express card account only in October 2012, so that Mr. Gill would have easier access to funds to pay for house expenses and veterinary care for the parties' dogs upon Mr. Van Nostrand's move to Brazil. At about the same time, the parties jointly leased a car for Mr. Gill to use to drive the dogs to the

---

[17] This is not to say that one party can defeat a determination that a common law marriage existed simply by testifying that he did not believe he was common law married. When the question is whether there was a common law marriage, the analysis turns on whether the parties made a mutual agreement to be permanent partners with the same degree of commitment as the spouses in a ceremonial marriage as of the time of the mutual consent, not whether either or both believed the term "common law married" applied to them. Actions speak louder than words in this regard, and a court may find such a mutual, present-tense agreement even if one party in his testimony denies the existence of the agreement. But if one party *credibly* testifies that he or she did not enter into such a mutual, present-tense agreement — meaning in part that other evidence does not render the party's testimony implausible — then the court may not find that a common law marriage existed.

veterinarian "and for other purposes" after Mr. Gill did not qualify for the lease in his own name. The court also noted that in 2005, after the parties discussed the creation of wills, durable powers of attorney, and health care directives, Mr. Van Nostrand had an attorney draft a will that named Mr. Gill as beneficiary and personal representative, drafted a durable power of attorney that named Mr. Gill as executor, and drafted a living will that gave Mr. Gill power of attorney for health care decisions. The court found that "[a]lthough [Mr. Gill] was supposed to draft documents giving [Mr. Nostrand] these same benefits and responsibilities, he failed to do so."

We recognize that in this day and age, couples make varying arrangements regarding their finances, such that the maintenance of "largely separate finances" is a far less salient consideration than it might have been in years past. But the trial court's focus was on the contrast between the financial arrangements Mr. Van Nostrand and Mr. Gill had on the one hand, and, on the other hand, the financial arrangements Mr. Van Nostrand had with Mr. da Silva after their ceremonial marriage. The court observed that Mr. Van Nostrand and Mr. da Silva established joint accounts early in their marriage and heard evidence that Mr. Van Nostrand and Mr. da Silva file joint tax returns and have wills, health care directives, and powers of attorney naming each other as beneficiaries or agents.

Mr. Gill argues that the court overlooked evidence that explains the parties' separate finances and why their documents were not completely reciprocal. For example, Mr. Gill explained that the parties made an attempt to keep their finances separate in case any of Mr. Gill's therapy clients were to sue him for malpractice (as one client did). Mr. Gill further explained that Mr. Van Nostrand was "closeted about" his health condition, and that he (Mr. Gill) was not sure that Mr. Van Nostrand would be as comfortable making health care decisions for Mr. Gill as Mr. Gill would be in making health care decisions for Mr. Van Nostrand. Mr. Gill also explained that he had no assets in his name and so did not need a will.[18] In addition, Mr. Gill emphasizes the evidence that he cared for Mr. Van Nostrand during the latter's serious illness; that Mr. Van Nostrand quickly engaged a lawyer when Mr. Gill had legal difficulty; that the parties discussed transferring an interest in the house to Mr. Gill; that the couple wore rings, intermingled their lives, and planned for each other's future; and that tax complications (i.e., the inability to file joint federal tax returns even when same-sex marriage became lawful in the

---

[18] Mr. Gill also asserts that the court overlooked his $20,000 contribution (from an inheritance after his mother's death) to the costs of remodeling the house where the parties lived. But Mr. Gill acknowledged at trial that the amount was only $17,000, and Mr. Van Nostrand testified that he owed this money to Mr. Gill and paid it back to Mr. Gill by paying the latter's legal expenses when he ran into legal difficulties.

District of Columbia) prevented them from getting married. But the trial court was not required to credit Mr. Gill's explanations or to give them the weight Mr. Gill urged. The court could just as readily conclude, from the fact that there was not a "totality of reciprocal relations," *Cerovic*, 134 A.3d at 780 (internal quotation marks omitted), that, even after the right to same-sex marriage became recognized in the District of Columbia, "the parties, for whatever reason, were not ready to be legally married" and to take on the particular complications marriage entails. *Bansda*, 995 A.2d at 199. We will not reweigh the evidence or disturb the court's credibility determinations. Nor do we discern that the court "overlook[ed] and discount[ed] significance evidence of commitment, shared responsibility, and envisioned permanence in the parties' agreement (and ensuing relationship)." As we have recognized in a different context, parties may have an intimate relationship, with "bonds of a genuinely familial, devoted, or homemaking nature," without necessarily having a common law marriage. *McKnight v. Scott*, 665 A.2d 973, 975 & n.3 (D.C. 1995) (internal quotation marks omitted).

Fifth, though acknowledging that this fact was not determinative of whether Mr. Gill believed he was in a common-law marriage with Mr. Gill, the trial court cited the evidence that Mr. Gill did not immediately object to Mr. Van Nostrand's wedding plans to Mr. da Silva; "did not . . . indicate that [the parties] needed to get

divorced first in order for [Mr. Van Nostrand and Mr. da Silva] to be able to marry"; and did so only after realizing that this would affect Mr. Gill's beneficiary status with respect to Mr. Van Nostrand's employee benefits and after consulting with an attorney and learning that he might have a claim against Mr. Van Nostrand under the theory that the parties were in a common law marriage. Mr. Gill asserts that he reacted as he did because he was not aware that the parties' relationship gave him legally enforceable rights vis-à-vis Mr. Van Nostrand. That is understandable, but the trial court's statement that this fifth factor was not determinative satisfies us that the court did not require the parties and Mr. Gill in particular to "meet expectations of . . . marital consciousness drawn from" traditionally defined marriage. In addition, we think the trial court exercised reasonable skepticism in light of Mr. Gill's financial incentive to claim that the parties had a common-law marriage.[19] Courts have long "regarded common-law

---

[19] The court expressly recognized the parties' financial motives for various steps they took during their relationship. With regard to the residence that Mr. Van Nostrand purchased, the parties entered into a lease agreement that listed Mr. Van Nostrand as the owner and Mr. Gill as the tenant. The court found that the parties agreed to describe the relationship as landlord-tenant in order to improve Mr. Van Nostrand's debt-to-income ratio for the purposes of obtaining a more favorable mortgage. The court also referred to Exhibit 18, an employee benefits affidavit in which Mr. Van Nostrand said that the couple "currently have and intend to have indefinitely, an exclusive mutual commitment to share responsibility for each other's welfare and financial obligations that is similar to that of a married couple." The court explained that it gave little weight to the "labels the parties used on various forms, such as domestic partner or landlord/tenant," because it was "clear

(continued…)

marriage as a fruitful source of fraud and perjury," *In re Estate of Danza*, 591 N.Y.S.2d 197, 198 (App. Div. 1992) (internal quotation marks omitted), and have explained that "[t]he perceived motivation for such perjury and fraud lies in the set of potential benefits of an after-the-fact recognition of a marriage not otherwise established by tangible proof such as a marriage certificate or formal wedding ceremony." *Carter*, 159 A.3d at 978.[20] Here, as the trial court found, Mr. Gill filed his complaint alleging a common-law marriage a little more than a week after Mr. Van Nostrand removed Mr. Gill from his Mr. Van Nostrand's employment-based health insurance coverage.[21] **[App. 54]**

_____

(…continued)

that the parties used the labels that they thought would be most financially advantageous at the time they completed the forms."

[20] *See also, e.g., Anderson v. Anderson*, 131 N.E.2d 301, 305 (Ind. 1956) (stating that common-law marriages "are a fruitful source of perjury and fraud") (internal quotation marks omitted); *In re Blecher's Estate*, 112 A.2d 129, 131 (Pa. 1955) (same).

Caution if not skepticism was also warranted in light of Mr. Gill's testimony that just as he "felt [that he and Mr. Van Nostrand] were married," he also "felt married" to Greg Prucey, a man with whom he was in a four-year relationship in Ohio prior to meeting Mr. Van Nostrand. No evidence was presented that either man sued to dissolve that "marriage" (though this may have been unnecessary based on when that marriage came into existence; Ohio abolished common law marriage for any such purported marriage that came into existence after October 10, 1991. *See* Ohio Rev. Code Ann. §3105.12(B) (2019)).

[21] To be sure, Mr. Van Nostrand had a financial incentive to claim that he and Mr. Gill did not have a common law marriage, but this is where the close

(continued…)

Finally, the trial court contrasted the facts of this case to those of *Carter*, 159 A.3d 970, in which the court found that there was a same-sex common law marriage. The *Carter* court found that Mr. Hunter proposed to Mr. Carter and gave him a diamond ring on Christmas Day 1996; that on February 18, 1997, Mr. Carter gave Mr. Hunter a ring engraved with that date; that the two men celebrated that date as their wedding anniversary for 16 years; and that they had joint banking and investment accounts and a joint mortgage, made mutual wills and health care powers of attorney, and referred to each other as spouses. *Id.* at 972–73. Although expressly "not suggesting that parties attempting to establish a same-sex common law marriage need prove all the factors proved by the plaintiff in *Carter*[,]" the trial court in the instant matter reasoned that Mr. Gill's "failure to prove any of these factors substantially undercuts his effort to prove the existence of a common law marriage." The court found that the parties here had at best "an agreement to get married at some point in the future." We cannot say that the trial court's

_____

(…continued)
scrutiny of claims of common law marriage and the presumption of the validity of a more recent ceremonial marriage discussed above work to favor Mr. Van Nostrand's position.

reliance on *Carter* as persuasive authority and its resultant analysis were legally or factually erroneous.[22]

For all the foregoing reasons, we are satisfied that the evidence did not compel the trial court to conclude that the parties had an express mutual agreement to be permanent partners with the same degree of commitment as the spouses in a ceremonial marriage. The evidence permitted the court to conclude, as it did, that the parties never expressly agreed to be married, in the present tense. *Id.*

Wherefore, the judgment of the Superior Court is

*Affirmed*.

---

[22] We note that the *Carter* court stated that "the exchange of rings is particularly strong evidence of . . . an intent" to marry. 159 A.3d at 981. Here by contrast, there was no clear evidence of an "exchange" of rings; Mr. Gill purchased two rings and put one on Mr. Van Nostrand's ring finger, but testified that he did not remember who put the other ring on his finger.