*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 23-PR-0126 & 23-PR-0730

IN RE ESTATE OF JACQUELINE LAVERNE MARTIN;
BRIAN MCCRAY, APPELLANT

Appeal from the Superior Court
of the District of Columbia, Probate Division
(2021-ADM-001449)

(Hon. Carmen G. McLean, Trial Judge)

(Submitted September 24, 2024                    Decided December 19, 2024)

*Ronald Dixon*, with whom *Charles Randolph* was on the briefs, for appellant.

*Ashley E. Wiggins* for appellees Juanita Waller and the Estate of Jacqueline Laverne Martin.

Before BECKWITH, EASTERLY, and DEAHL, *Associate Judges*.

DEAHL, *Associate Judge*:  These appeals arise from a probate matter concerning the estate of Jacqueline Martin. For more than four decades before her death, Jacqueline was in a romantic relationship with Herbert McCray.[1] When Jacqueline died without a will, Herbert sought to administer and inherit her estate,

---

[1] Given the shared last names of some of the principal players in this case, we generally refer to the relevant actors by their first names to avoid any confusion.

contending that he was her common law husband.  Herbert then died and his son, Brian McCray, sought to stand in his shoes to administer Jacqueline's estate and to inherit it on the theory that it had first passed to Herbert and became part of his estate, which then passed to Brian.  Jacqueline's first cousin, Juanita Waller, countered with her own petition to administer Jacqueline's estate on the theory that she was her next of kin because Jacqueline and Herbert were not in fact common law married.  The trial court appointed Juanita as the personal representative of Jacqueline's estate after concluding that—even if Herbert and Jacqueline had been common law married—Juanita had priority over Brian to administer the estate.

The case then proceeded to trial on the question of whether Herbert and Jacqueline were common law married; if so, it seems Brian is the rightful heir to her estate, and if not, Juanita is apparently in line to inherit it.  After a trial in which the court effectively limited the presentation to direct evidence of whether Jacqueline and Herbert ever had an "express mutual agreement . . . in words of the present tense" to be permanent partners, the court ruled in Juanita's favor.  The court concluded that there was no express mutual agreement in the present tense for Jacqueline and Herbert to be married.  Brian now appeals.

Brian's principal argument on appeal is that the trial court erred when it precluded him from introducing a variety of circumstantial evidence that Jacqueline

and Herbert had an express mutual agreement to be permanent partners. We agree and remand the case for a new trial. While there can be no common law marriage absent an express mutual agreement to be permanent partners, when neither partner is available to testify (as here, where they were both deceased) such an agreement may be inferred from the circumstances surrounding a couple's relationship. *Mesa v. United States*, 875 A.2d 79, 83 (D.C. 2005) ("[T]he existence of an agreement may be inferred from the character and duration of cohabitation, or from other circumstantial evidence such as testimony by relatives and acquaintances as to the general reputation regarding the parties' relationship." (quoting *Marcus v. Dir., Off. of Workers' Comp. Programs*, 548 F.2d 1044, 1048 n.9 (D.C. Cir. 1976))). The trial court improperly precluded Brian from introducing circumstantial evidence that might have supplied an inference of such an agreement, so he is entitled to a new trial in which he is permitted to adduce the relevant evidence on that topic.

## I. Factual and Procedural Background

Jacqueline Martin and Herbert McCray were romantic partners from the 1970s until Jacqueline died in 2020. The couple never had a formal wedding ceremony, but when Jacqueline died without a will, Herbert filed a petition for probate, seeking to administer and inherit Jacqueline's estate on the grounds that they were common law married. Herbert died about fifteen months after Jacqueline

with his petition still pending. His son Brian then sought to have Herbert's estate "substituted as the Petitioner" in the matter, so that Herbert's estate could act as the personal representative of Jacqueline's estate.

Jacqueline's first cousin, Juanita, filed her own petition for probate and sought to dismiss Herbert's petition because his death meant that he could no longer serve as personal representative of Jacqueline's estate. Juanita further argued that Brian's attempt to substitute his father's estate as the petitioner was ineffectual, because one estate cannot be the personal representative of another—only a "person" can serve in that role. D.C. Code § 20-101(j) (defining personal representative as a "*person* . . . appointed . . . to administer the estate of a decedent*" (emphasis added)). The trial court agreed that Juanita should be appointed the personal representative of Jacqueline's estate as her next of kin with statutory priority to serve in that role. D.C. Code § 20-303(a)(1)(H). The court reasoned that even if Herbert had priority to serve as personal representative as Jacqueline's surviving spouse when he was alive, that statutory priority would not pass to Brian (or any other personal representative of his estate) upon Herbert's death. The trial court thus granted Juanita's petition for probate and named her the personal representative of Jacqueline's estate, dismissed Herbert's competing petition for probate, and denied Brian's motion to substitute Herbert's estate as the petitioner.

The trial court then turned its attention to Brian's claims for inheritance, which the parties agreed turned on the disputed question of whether Herbert was Jacqueline's surviving spouse at the time she died. If the two were married, then Jacqueline's estate would have passed to Herbert upon her death, and then when Herbert died it would have become part of his estate, which Brian was apparently in line to inherit. After discovery, the trial court denied Juanita's motion for summary judgment because it determined that there were genuine issues of material fact regarding whether Jacqueline and Herbert were common law married.

The court then scheduled a trial dedicated to one question: whether Jacqueline and Herbert had an "express mutual agreement . . . in words of the present tense" to be permanent partners, which is one of the requirements for forming a common law marriage. *See generally Cleary v. Cleary*, 318 A.3d 536, 540 (D.C. 2024) (quoting *Gill v. Nostrand*, 206 A.3d 869, 875 (D.C. 2019)). Only if Brian made that first showing would the trial proceed to a second stage concerning the other elements of a common law marriage—namely, whether Jacqueline and Herbert had "the same degree of commitment as the spouses in a ceremonial marriage" and "cohabitate[d]" after their agreement. *Id.* (quoting *Gill*, 206 A.3d at 875). The trial court bifurcated the trial in that manner in the interests of efficiency, opining that "there's no dispute that many people thought of [Jacqueline and Herbert] as [a] married couple" and that they "acted like a married couple," but expressing doubt about whether Brian's

proffered evidence could satisfy the "express mutual agreement" requirement of common law marriage. The court thus limited the parties, at the first stage of trial, to introducing "evidence *exclusively* on the issue of 'express mutual agreement, which must be in words of the present tense.'"

Brian presented two witnesses at the first stage of the trial (there would not be a second): himself and his wife, Tanya McCray. Brian previewed that both he and Tanya would testify to a May 30, 2015, gathering at his home during which Jacqueline and Herbert—in rather uncertain terms—"recommitted to their present [t]ense marriage to each other to [be] married as husband and wife." To the extent they tried to testify about Jacqueline and Herbert's relationship more broadly, they were generally precluded from doing so.

Brian testified first. He said that Herbert separated from Brian's biological mother (Doris McCray) in the early 1970s, when Brian was two years old. Then in the late 1970s, when Brian was about ten years old, Herbert introduced him to Jacqueline, and from that point forward she was "in [his] life"—the three of them traveled, celebrated holidays, and "did everything together." The trial court promptly halted the direct examination there, and directed Brian to speak "exclusively" to whether there was a "mutual agreement in [the] present tense" to be permanent partners. Brian's counsel objected that he wished to adduce evidence

about Brian's "relationship with [Jacqueline] and the relationship she shared with" Herbert, but the trial judge retorted that she had already precluded evidence like that "when [she] bifurcated the trial." Counsel persisted that in order to evince an express mutual agreement adequately he had to get into the relevant background of the relationship. The court disagreed—"No, you do not need to go into the background"—and instructed counsel to "[r]estrict yourself" to evidence of an express mutual agreement "or you will waive the right to have [Brian's] testimony on that element."

Counsel's next question to Brian was whether Jacqueline referred to him as a son, which Brian answered in the affirmative before the court again interrupted and said that had "nothing at all to do with whether or not there was a mutual agreement in [the] present tense." Counsel again persisted that by precluding him from "question[ing] this witness about background" the court had "put[] everything in a vacuum that could not be filled." The court disagreed and then gave counsel "one more chance" to comply with the court's orders, on threat of "waiving" direct examination. Counsel then elicited some brief testimony about how Jacqueline had called Brian to a May 30, 2015, family gathering, but when counsel sought to elicit

Brian's reaction to that call the court terminated the direct examination, ruling that it had gone beyond the limited scope of the limited hearing.[2]

Brian's account of the May 2015 meeting ultimately came out through his cross- and redirect examinations. According to Brian, Jacqueline initiated that meeting to talk through estate planning so that Herbert would be cared for if she died before him. In her words, Herbert had "always treated [her] like a wife" and she "look[ed] at him like [her] husband." Brian testified that at the May 2015 meeting Jacqueline and Herbert "basically stated that they were going to hold themselves as man and wife," "[t]hat [Jacqueline] looked at [Herbert] as a husband," and that she "always ha[d]." Herbert likewise expressed that "he looked at [Jacqueline] as his wife." Tanya testified along the same lines—that Herbert and Jacqueline expressed their "love for each other" at the meeting and said that "they were in a husband and wife relationship."

Beyond those two witnesses, Brian sought to admit several exhibits that the court excluded because they did not relate to any "express mutual agreement."

---

[2] We note that Brian's counsel had a penchant for delving into the irrelevant (and has not shaken that tendency in his appellate briefing). For instance, counsel began his opening argument by waxing about the case's procedural history, including detailing the judges Herbert's petition had originally been assigned to and what had transpired at past hearings—all completely irrelevant to the matter at hand. We can only presume that influenced the court's decision to bifurcate the trial and to give counsel little leeway to venture outside of its narrow confines.

These exhibits included declarations from Jacqueline's friends that stated, among other things, that Herbert and Jacqueline were "perceived" or "assumed to be and treated as if they were husband and wife" by those who knew them. The court also excluded Brian's own affidavit, save for one of its twenty-six sentences in which he explained that Jacqueline and Herbert called the May 2015 meeting "to announce that they were husband and wife at that time" and were "committed to each other like any other married couple." The court explained that these declarations did not speak to Herbert and Jacqueline "*actually being married*" or to the declarants observing an express mutual agreement between the two at any point. Rather, in the trial court's view, the declarations spoke only to the couple's behavior and shared life, including that they "act[ed] as a husband and wife would act" and "left this impression on others."

Juanita testified in support of her position that the couple was not common law married. She testified that even after the 2015 meeting, Jacqueline made numerous statements indicating that she did not consider herself to be married. Most of these statements came up in the context of Juanita's assistance with Jacqueline's tax returns, in which Jacqueline consistently represented that she was not married even in the years after the purported May 2015 gathering.

After hearing the evidence, the court generally credited all three of the witnesses. It credited Brian's account that Jacqueline scheduled a family meeting for May 30, 2015, at which she "intended to announce . . . that she and [Herbert] were husband and wife," but found that once there, she and Herbert "did *not* make an 'express mutual agreement . . . in words of the present tense' to be married" nor were any actions taken "that would lead to an inference" of one. It also found that Jacqueline had told Juanita on multiple occasions after 2015 that she was not married. Ultimately, the trial court ruled that Brian failed to establish any express mutual agreement between Jacqueline and Herbert to be permanent partners.

Brian now appeals.

## II. Analysis

We first address Brian's principal argument: that the trial court improperly restricted the evidence at trial. We agree with him about that. We then address the remainder of his arguments, none of which has merit.

### A. *The court improperly restricted the evidence of express mutual agreement*

Brian's lead argument is that the trial court improperly restricted the evidence he was permitted to introduce on the question of whether Jacqueline and Herbert had an express mutual agreement to be permanent partners. He argues that it did so by

bifurcating the trial into two stages and precluding him from introducing a variety of evidence that he contends was relevant to whether Jacqueline and Herbert had an express mutual agreement to be permanent partners. Namely, the trial court precluded him from introducing evidence (1) about the background of Jacqueline and Herbert's relationship, (2) their cohabitation, (3) their reputation in the community for being married, and (4) virtually everything beyond direct evidence of the particular words that evinced an express mutual agreement to be permanent partners. Juanita does not dispute that the trial court placed these restrictions on Brian's presentation of evidence, as the record recounted above reflects. We generally review restrictions on a party's presentation of evidence "for abuse of discretion, recognizing that it is necessarily such an abuse for the trial court to employ incorrect legal standards." *Wilson v. United States*, 266 A.3d 228, 240 (D.C. 2022) (quoting *In re C.A.*, 186 A.3d 118, 121 (D.C. 2018)).

There are three elements of a common law marriage in the District. They are: (1) that the couple "cohabitate[d] as spouses" (2) "following an express mutual agreement . . . in words of the present tense, to be permanent partners" (3) "with the same degree of commitment as the spouses in a ceremonial marriage." *Cleary*, 318 A.3d at 540 (quoting *Gill*, 206 A.3d at 875). Only the second element is directly at issue in this appeal, but as we will explain, evidence of the first and third elements could not be properly excluded because it is quite relevant to that second element.

"[T]he best evidence of an express agreement to be married is the testimony of the parties" to that agreement. *Id.* at 542 (quoting *East v. East*, 536 A.2d 1103, 1106 n.2 (D.C. 1988)).  So "[w]hen one of the parties to the alleged marriage asserts its existence [and testifies,] but either denies or fails to say there was mutual consent or agreement, then mere cohabitation, even though followed by reputation [for being married], will not justify an inference of mutual consent or agreement to be married." *Coates v. Watts*, 622 A.2d 25, 27 (D.C. 1993) (quoting *U.S. Fid. & Guar. Co. v. Britton*, 269 F.2d 249, 252 (D.C. Cir. 1959)); *see also East*, 536 A.2d at 1106 n.2 ("[W]hen one of the parties to the alleged marriage asserts its existence and testifies, he or she must affirmatively state that there was such an agreement."); *McCoy v. District of Columbia,* 256 A.2d 908, 909-10 (D.C. 1969) (despite evidence of the purported spouses' cohabitation and general reputation to be married, the trial court was "compel[led]" to find no common law marriage because the alleged widow "failed to disclose [in her testimony] any evidence relating to such an agreement").[3] In that instance, the testifying partner must recount an exchange that "'inescapably

---

[3] In *Mesa*, we suggested that even when the purportedly married parties are available to testify, an express mutual agreement might nonetheless be inferred from circumstantial rather than direct evidence.  875 A.2d at 83 (saying as much where the purportedly married parties were available to testify).  That suggestion appears to be inconsistent with our earlier pronouncements in *Coates*, *East*, and *McCoy*, but because neither Jacqueline nor Herbert was available to testify in this case, we need not ultimately resolve any potential inconsistency in our precedents here.

and unambiguously impl[ies] that an agreement was being entered into to become' spouses at that very moment." *Cleary*, 318 A.3d at 541 (quoting *Gill*, 206 A.3d at 875).

But the same is not true in a case like this one, where neither Jacqueline nor Herbert was available to testify because they were both deceased, so that the best evidence of whether they had an express agreement was simply not available. When that is the case, we have never held that there is a strict requirement for direct evidence of an express mutual agreement. We have instead indicated, and today hold, that such an agreement can "be inferred from the character and duration of [the couple's] cohabitation, or from other circumstantial evidence such as testimony by relatives and acquaintances as to the general reputation regarding the parties' relationship." *Mesa*, 875 A.2d at 83 (quoting *Marcus*, 548 F.2d at 1048 n.9); *see also Britton*, 269 F.2d at 252 n.3 (quoting *Carretta v. Carretta*, 58 So.2d 439, 441 (Fla. 1952) for the proposition that "proof of general repute and cohabitation as man and wife will support a presumption of marriage when the agreement is denied and cannot be proven by the best evidence").

While the trial court at one point acknowledged that an agreement could be inferred from circumstantial evidence, it erroneously precluded Brian from presenting the very evidence that might supply such an inference. It did so broadly

when it bifurcated the trial and thereby precluded evidence about how Jacqueline and Herbert cohabitated and had the same degree of commitment as the spouses in a ceremonial marriage, which are distinct elements of a common law marriage but can also supply circumstantial evidence of an express agreement to be permanent partners. And it did so on a more granular level (1) when it precluded Brian and Tanya from testifying about "the relationship [Jacqueline] shared with [Herbert]," (2) when it barred counsel from questioning them about the couple's reputation in the community for being married, and (3) when it excluded witness affidavits about Jacqueline and Herbert's reputation in their community as a married couple on the basis that they did not bear on whether they had an express mutual agreement to be permanent partners.[4]

In sum, the trial court's bifurcation order and its efforts to limit the trial to direct evidence of "the words that were used" at the May 2015 meeting erroneously precluded Brian from making his case through circumstantial evidence. Contrary to the trial court's reasoning, Brian did not need direct proof of an express present tense

---

[4] The trial court suggested that it would likely exclude the witness affidavits as hearsay "[i]f we move on to the second stage" of trial, correctly rejecting Brian's argument that the court could take "judicial notice" of the affidavits—that is not the workaround to the rules against hearsay that counsel posited it to be. While we agree that the affidavits could have been excluded as hearsay, the only basis on which the court ultimately excluded the bulk of them was their irrelevancy to the issue of an express mutual agreement, when in fact they were relevant to that.

agreement to be permanent partners—that is a requirement only when one of the partners to the purported marriage asserts its existence and testifies. *See Coates*, 622 A.2d at 27; *East*, 536 A.2d at 1106 n.2; *McCoy,* 256 A.2d at 909-10; *Britton*, 269 F.2d at 252. Brian should have been permitted to make his case circumstantially, through evidence about Jacqueline and Herbert's relationship, their cohabitation, and their general reputation in the community as a married couple. Such evidence can supply an inference of an express agreement to be permanent partners, even if Brian and Tanya were incapable of recounting such an agreement themselves (at the May 2015 meeting or otherwise). We therefore reverse for a new trial in which Brian can introduce the universe of relevant evidence that was precluded at the first trial.[5]

---

[5] We pause to note one additional legal error in the trial court's analysis—it opined that Jacqueline and Herbert could not have entered into an express mutual agreement to be married before 1989, when Herbert formally divorced Doris. That is not quite right. We have explained that when an express mutual agreement to be married is made at a time when there is a legal impediment to the union, such as a pre-existing marriage, "the removal of [that] impediment while parties continue to live together as husband and wife gives rise to a common-law marriage." *In re Estate of Jenkins*, 290 A.3d 524, 530 (D.C. 2023) (quoting *Thomas v. Murphy*, 107 F.2d 268, 269 (D.C. Cir. 1939)). So a common law marriage could in fact be supported by a pre-1989 express mutual agreement between Jacqueline and Herbert to be married provided that they continued to cohabitate thereafter.

## *B. Brian's remaining arguments lack merit*

We now turn to the remainder of Brian's arguments. He first contends that the trial court erred when it rejected his petition to appoint Herbert's estate as the personal representative of Jacqueline's estate, and he complains that the trial court erroneously addressed that issue before determining whether Jacqueline and Herbert were common law married. We disagree. Even if Jacqueline and Herbert were married, that would not provide any basis to appoint Herbert's estate as the personal representative of Jacqueline's estate. While Herbert himself would have statutory priority over Juanita to serve as personal representative of her estate if he were a surviving spouse, that priority does not pass to his estate. *See* D.C. Code § 20–303(a)(1)(B), (H). And Brian has never articulated any basis on which he himself has statutory priority over Juanita, but instead relies purely on Herbert's own priority, which was extinguished at the time of his death. *Id.* So we decline to further examine whether Brian had any priority to represent Jacqueline's estate in his own right.[6]

---

[6] Juanita argues that this issue is "moot" because Brian ultimately rescinded his request before the trial court to appoint Herbert's estate as the personal representative. This argument confuses mootness with preservation. *See Long v. United States*, 312 A.3d 1247, 1256 (D.C. 2024) ("Mootness is not indexed to the particular claims raised before the trial court."). We do not address the question of preservation because we discern no abuse of discretion in the trial court's ruling in any event.

Second, Brian argues that Juanita's petition to serve as personal representative was "factually insufficient and fraudulent" because it was predicated on the falsehood that Jacqueline and Herbert were not married. Not so. As we have explained, even if Jacqueline and Herbert were married that would not confer any priority on Herbert's estate to act as the personal representative of Jacqueline's estate, and that was the basis on which the trial court granted Jacqueline's petition. If Jacqueline ultimately turns out to be wrong in her assertion that the couple was not married, that would not make her petition fraudulent (there is no basis to say her assertion was knowingly false). And it would not alter the conclusion that Herbert's estate had no priority to serve as personal representative.

Third, Brian argues that the trial judge was biased against him and prejudged his case, pointing to various pretrial statements in which the trial court expressed doubt about his ability to prove up a common law marriage. That is not any serious evidence of bias. This court and others "have long 'regarded common-law marriage as a fruitful source of fraud,'" given that litigants seeking pecuniary benefit have often made unsubstantiated claims of a common law marriage. *Gill*, 206 A.3d at 883 (quoting *In re Estate of Danza*, 188 A.D.2d 530, 530-31 (N.Y. App. Div. 1992)). We have thus repeatedly recognized that "claims of common law marriage should be closely scrutinized" and subjected to skepticism, given the ready availability of "ceremonial marriage." *See, e.g.*, *Gill*, 206 A.3d at 876 (first quoting *Cerovic v.*

*Stojkov*, 134 A.3d 766, 776 (D.C. 2016), then quoting *Bansda v. Wheeler*, 995 A.2d 189, 198 (D.C. 2010)).  The trial court's own skepticism merely echoed these well-founded sentiments.

Fourth, and finally, Brian claims that the trial court clearly erred when it held that the evidence regarding the May 2015 meeting did not itself establish a present tense mutual agreement between Jacqueline and Herbert to be permanent partners. If he were right about that, it would be a basis to direct a ruling in his favor on this question.  But we disagree with him.  For starters, the trial court was of course under no obligation to credit Brian and Tanya's testimonies about that meeting—it was free to discredit their self-interested accounts.  Putting that aside, the trial court was correct that neither Brian nor Tanya testified to any particular words that were exchanged that "'inescapably and unambiguously impl[ied] that an agreement was being entered into to become' spouses at that very moment."  *Cleary*, 318 A.3d at 541 (quoting *Gill*, 206 A.3d at 875).  Their testimonies were instead mired in vague and conclusory descriptions of what was said.  For instance, Brian testified that Herbert "basically said he looked at [Jacqueline] as his wife," and that Jacqueline "basically stated that they were going to hold themselves as man and wife" and that "she looked at him as a husband."  Tanya similarly testified that the couple said they were in "like a spousal relationship" as "life partner[s].  Do you know what I mean?" While those vague abstractions were not fatal to Brian's case, since as we have

explained he might prove it circumstantially, the trial court was right that this was not direct evidence of a clear and unambiguous agreement to be permanent partners with the trappings of a marriage.

### III. Conclusion

For the foregoing reasons, we reverse the trial court's judgment in appeal number 23-PR-730 and remand the case for a new trial. Parties can make express mutual agreements to be permanent partners and, upon their deaths, there might be no percipient witnesses to that agreement. In such cases, our precedents recognize that the parties' relationship—including how they held themselves out to others, the extent of their cohabitation, and their reputation in the community—can supply an inference that the couple had an express agreement to be permanent partners. While we doubt that any amount of circumstantial evidence would ever compel a trial court to make such a finding, the court must still permit the universe of relevant evidence on that topic so that the fact finder's verdict is based on all relevant and admissible evidence.

We affirm the trial court's ruling in appeal number 23-PR-126, appointing Juanita Waller as the personal representative of Jacqueline Martin's estate.